## NATIONAL FIREPROOFING CO. v. MASON BUILDERS' ASS'N et al.

(Circuit Court of Appeals, Second Circuit. March 26, 1909.)

No. 187.

1. CONTRACTS (§ 136*)—INJUNCTION (§ 61*)—AGREEMENTS IN RESTRAINT OF TRADE—REMEDIES.

Agreements creating a monopoly in restraint of trade and against public policy, though invalid and unenforceable, are not illegal in the sense of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

giving a right of action to third persons for an injury sustained, nor as affording ground for an injunction against threatened injury.

[Ed. Note.—For other cases, see Contracts, Dec. Dig. § 136;* Injunction, Dec. Dig. § 61.*]

Monopolistic Contracts—validity as affected by public policy, see note to Cravens v. Carter-Crume Co., 34 C. C. A. 486.]

2. MONOPOLIES (§§ 24, 28*) — FEDERAL ANTI-TRUST ACT—INJUNCTIVE REMEDY—RIGHTS OF INDIVIDUALS.

A person injured by a violation of the federal anti-trust act cannot sue for an injunction thereunder; his sole remedy being a suit to recover treble damages, and the injunctive remedy being available to the government only.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. §§ 17, 18; Dec. Dig. §§ 24, 28.*]

3. MONOPOLIES (§ 8*)—DEFINITION.

A "monopoly" is the concentration of business in the hands of a few.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 8.*

For other definitions, see Words and Phrases, vol. 5, pp. 4570–4573.]

4. MONOPOLIES (§ 12*)—STATUTES—AGREEMENTS.

An agreement between a mason builders' association and bricklayers' unions in the city of New York that the builders' association should include in their contracts for building all cutting of masonry, interior brickwork, fireproofing, etc., and should not lump or sublet the installation thereof if the labor in connection therewith is bricklayers' work, as recognized by the trade, but that the men employed on the walls should be given preference, and that no members of the bricklayers' union should work for any one not complying therewith, did not constitute a monopoly, within the New York statute providing that every contract or combination whereby a monopoly in the manufacture, production, or sale in the state of any article, or commodity of common use is or may be created, established, or maintained. etc., is against public policy, illegal, and void.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 12.*]

5. CONSPIRACY (§ 1*)—DEFINITION—"CIVIL CONSPIRACY."

A "conspiracy" is a combination to effect an illegal object as an end or means, and a "civil conspiracy" is a combination of two or more persons to accomplish by concerted action an unlawful or oppressive object, or a lawful object by unlawful or oppressive means.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. § 1; Dec. Dig. § 1.*

For other definitions, see Words and Phrases, vol. 2, pp. 1193, 1454–1461; vol. 8, p. 7613.]

6. CONSPIRACY (§ 6*)—ACTION—ELEMENTS.

To warrant an action for conspiracy, damage must have resulted from the combination.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. § 5; Dec. Dig. § 6.*]

7. INJUNCTION (§ 101*)—CONSPIRACY—DAMAGE.

To justify an injunction against a conspiracy, damage must have been threatened.

[Ed. Note.—For other cases, see Injunction, Dec. Dig. § 101.*]

8. CONSPIRACY (§ 3*)—OBJECT—ILLEGALITY.

The direct object or purpose of a combination furnishes the primary test of its illegality; it being insufficient to show that it works harm to others incidentally, unless it was entered into for the primary purpose of injuring another, in which case it is not rendered valid by the fact that it may incidentally benefit the parties thereto.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. § 3; Dec. Dig. § 3.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

9. CONSPIRACY (§ 3*)—COMBINATION OF LABORERS—MOTIVE—OBJECT—MEANS.

Several laborers may combine for mutual advantage, and so long as the motive is not malicious, the object not unlawful or oppressive, and the means neither deceitful nor fraudulent, the result is not a conspiracy, although it may necessarily work injury to others.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. § 3; Dec. Dig. § 3.*]

10. CONSPIRACY (§ 3*)—COMBINATION OF LABORERS AND BUILDERS—VALIDITY.

An agreement between a master mason builders' association and bricklayers' unions in the city of New York prohibited the association from subletting interior brickwork, fireproofing, etc., but requiring that such work be included in the building contracts, and that the men employed on the construction of the walls should be given a preference in performance thereof, and that no members of the bricklayers' unions should work for any one not complying with the rules and regulations of the agreement. *Held*, that such agreement was for the special benefit of the bricklayers, and was not intended to injure complainant, a nonresident corporation authorized to do fireproofing alone, and hence, though the agreement operated to complainant's prejudice, it was not a conspiracy against which complainant had any remedy.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. § 3; Dec. Dig. § 3.*]

11. CONSPIRACY (§ 3*)—STATUTES—OBJECT.

An agreement between a mason builders' association and bricklayers' unions in the city of New York, prohibiting the subletting of interior brickwork, fireproofing, etc., and requiring that the men employed on the outside walls of a building be given preference in the performance of such inside work, did not constitute a conspiracy prohibited by Pen. Code N. Y. § 168, subds. 5, 6; the test of the application of the statute being the purpose of the combination, which, if lawful and carried out by lawful means, shows absence of conspiracy, though a third person may be incidentally injured.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. § 3; Dec. Dig. § 3.*]

Appeal from the Circuit Court of the United States for the Southern District of New York.

See, also, 145 Fed. 260.

This is an appeal from a decree of the Circuit Court for the Southern District of New York dismissing a bill of complaint in a suit in equity.

The complainant is a corporation under the laws of the state of Pensylvania and is authorized by its charter to manufacture and install fireproofing. Since its organization it has been engaged almost exclusively in the manufacture and installation of what is known as hollow tile fireproofing and produces over 50 per cent. of the entire output of that article in the United States.

The defendant Mason Builders' Association is a corporation under the laws of the state of New York, composed of master mason builders doing business in the city of New York, but comprising less than a majority of the mason builders of that city.

The defendants the various Bricklayers' Unions, with four exceptions which are chartered, are unincorporated associations. Practically every bricklayer in the city of New York and Long Island is a member of one of these unions.

The object of this suit is to restrain the enforcement of, and to have declared void, an agreement entered into between the Mason Builders' Association and the Bricklayers' Unions, upon the ground that it unlawfully interferes with the business and property of the complainant.

The agreement in question between the Mason Builders' Association and the Bricklayers' Unions is a biennial trade agreement covering the years

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

1906 and 1907 and relating to rates of wages, hours of labor, the settlement of differences by arbitration, and many other matters in the building trade affecting the interests of the parties. The particular clauses to which the complainant objects are the following:

"(5) The members of the Mason Builders' Association must include in their contracts for building all cutting of masonry, interior brickwork, the paving of brick floors, the installing of concrete blocks, the brickwork of the damp-proofing system and all fireproofing-floor arches, slabs, partitions, furring and roof blocks—and they shall not lump or sublet the installation, if the labor in connection therewith is bricklayers' work as recognized by the trade, the men employed upon the construction of the walls to be given the preference."

"(10) No members of these Bricklayers' Unions shall work for any one not complying with all the rules and regulations herein agreed to."

The first agreement between the Builders' Association and the unions was entered into in 1885 and provided only for rates of wages, hours of labor, and arbitration of differences. The agreements since that time have embraced the provisions of the original agreement and also a gradually increasing number of other important stipulations. Clause 5 in substance was inserted in the agreement of 1893 at the request of the unions and has been retained in subsequent agreements. Clause 10 was inserted in the agreement at the request of the association. The precise time when this was done does not appear, but the clause was in force before the complainant started business in the city of New York.

The work of installing tile fireproofing is considered to be bricklayers' work by the trade, and it would be impracticable for the complainant to undertake such work in the city of New York without employing members of the Bricklayers' Unions. Clause 10, however, provides that members of the unions shall only work for persons complying with all the rules and regulations of the agreement. Among them is clause 5, which provides that the work of installing fireproofing shall not be sublet by a contractor, but must be included in the contract for the building. It follows therefore that these two clauses operate to prevent the complainant from installing its fireproofing in New York City unless it takes the entire contract for erecting a building, which it is not authorized by its charter to do.

In actual operation, too, the clauses in question have prevented the complainant from carrying out contracts for the installation of fireproofing. Thus in 1903 the complainant had a contract with the George A. Fuller Company—a general contractor not a member of the Builders' Association —for installing fireproofing in a building which it was erecting under contract in New York City. The association notified the complainant that its agreement with the unions forbade building contractors subletting the installation of fireproofing, and subsequently all the bricklayers employed upon the building—including those engaged upon the fireproofing—struck. Consequently the complainant was obliged to cancel its contract. Other similar instances are shown in the testimony.

It is evident therefore that these clauses affect owners and general contractors as well as a person who, like the complainant, desires to take separate fireproofing contracts. An owner is practically unable to make a contract for fireproofing alone because if he does the bricklayers will not only refuse to do that work, but will decline to do the other work upon the building. A general contractor, whether a member of the association or not, practically cannot sublet the fireproofing because if he does he will violate clause 5, and the bricklayers will refuse to work for him.

The defendants claim that the object of clause 5 is to benefit the bricklayers by giving them inside as well as outside work and by preventing specialization in their trade. This subject is fully considered in the opinion.

The object of clause 10 is, obviously, to make the trade agreement effective by extending its operation to third persons requiring the labor of bricklayers. While members of the unions may work for others than members of the association, they can only work for such employers as follow the rules and regulations of the agreement. Should the complainant obtain the power to make general building contracts and enter into such con-

tracts, it could then obtain the services of members of the unions in setting the fireproofing required. The complainant, however, does not wish to do business in this manner. It desires to take separate contracts for fireproofing installation and is prevented from so doing business by the operation of the clauses in question.

The allegations of the amended complaint with respect to a combination to injure the complainant, accompanied by threats and intimidation—except as they relate to the enforcement against it of these clauses—are not supported by the evidence. Whatever the defendants have done has been for the enforcement of such clauses, and if they are valid, and their execution and enforcement in the manner shown lawful, no independent cause of action is established.

James W. Osborne (Henry E. Lineaweaver, of counsel), for appellant.

Eidlitz & Hulse (Frederick Hulse, of counsel), for appellees Mason Builders' Ass'n and others.

Arthur Ofner and Joseph Forrester, for appellees Bricklayers' Union No. 1 and others.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

NOYES, Circuit Judge (after stating the facts as above). In considering the legal questions arising in this case, it must be borne in mind at the outset that it is not sufficient to show that the agreement in question may create a monopoly, may be in restraint of trade, or may be opposed to public policy. Agreements of that nature are invalid and unenforceable. The law takes them as it finds them, and as it finds them leaves them; but they are not illegal in the sense of giving a right of action to third persons for injury sustained. Brown v. Jacobs' Pharmacy Co., 115 Ga. 433, 41 S. E. 553, 57 L. R. A. 547, 90 Am. St. Rep. 126. And upon similar principles it seems equally clear that they afford such persons no ground for seeking an injunction against injury threatened.

But the complainant asserts that the agreement in this case is positively unlawful and not merely negatively invalid—that it contravenes both national and state statutes against combinations, and thus does give rights of action to injured persons. With respect to the federal statute, it is not obvious in what way a trade agreement between builders and bricklayers, relating to their work in the state of New York, can be said to directly affect interstate commerce; but the consideration of this question is not necessary because a person injured by a violation of the federal act cannot sue for an injunction under it. The injunctive remedy is available to the government only. An individual can only sue for threefold damages. Greer v. Stoller (C. C.) 77 Fed. 2; Southern Indiana Exp. Co. v. United States Exp. Co. (C. C.) 88 Fed. 663. See, also, Bement v. National Harrow Co., 186 U. S. 87, 22 Sup. Ct. 747, 46 L. Ed. 1058; Post v. Southern R. Co., 103 Tenn. 184, 52 S. W. 301, 55 L. R. A. 481; Metcalf v. American School-Furniture Co. (C. C.) 108 Fed. 909; Block v. Standard Distilling, etc., Co. (C. C.) 95 Fed. 978; Gulf, etc., R. Co. v. Miami Steamship Co., 86 Fed. 407, 30 C. C. A. 142; Pidcock v. Harrington (C. C.) 64 Fed. 821; Hagan v. Blindell, 56 Fed. 696, 6 C. C. A. 86, affirming Blindell v. Hagan (C. C.) 54 Fed. 40.

The statute of New York which it is claimed that the defendants violate provides in its first section as follows:

"Every contract, agreement, arrangement or combination, whereby a monopoly in the manufacture, production or sale in this state of any article or commodity of common use is or may be created, established or maintained, or whereby competition in this state in the supply or price of any such article or commodity is or may be restrained or prevented, or whereby, for the purpose of creating, establishing or maintaining a monopoly within this state of the manufacture, production or sale of any such article or commodity, the free pursuit in this state of any lawful business, trade or occupation, is or may be restricted or prevented, is hereby declared to be against public policy, illegal and void." Laws 1899, p. 1514, c. 690.

The complainant says that the agreement in question violates this statute because it tends to create a monopoly in the hands of members of the association and other general contractors who comply with its provisions. It may well be doubted, however, whether a combination of employers and employés in the building trade could ever be for the purpose of creating a monopoly "in the manufacture, production or sale in this state of any article or commodity of common use." Be that as it may, the thing which is essential to the existence of a monopoly—the concentration of business in the hands of a few—is not present here. The business of installing fireproofing in the city of New York is open to all who choose to engage in it under existing economic conditions. General contractors cannot be said to have a monopoly when any person can be a general contractor. Members of the unions cannot be said to be monopolists when any qualified bricklayer can join a union. Moreover, while it is probable under the New York decisions (Rourke v. Elk Drug Co., 75 App. Div. 145, 77 N. Y. Supp. 373) that a person specially injured by a violation of this anti-monopoly statute would have a right of action for damages, it seems, upon the principle of the cases cited with respect to the federal statute, that only the Attorney General can sue for an injunction; such a suit being authorized by a section of the statute.

The complainant, thus failing to show any right to an injunction upon the ground that the agreement is contrary to public policy or in contravention of any state or national anti-trust statute, can only establish that it is entitled to such relief by showing that the execution of the agreement amounted to a conspiracy, and that its enforcement threatens injury; and to ascertain whether the complainant has established this requires the examination of a most important phase of the law of conspiracies as affecting combinations of labor and combinations between labor and capital.

A "conspiracy" may be broadly defined as a combination to effect an illegal object as an end or means. And a "civil conspiracy," which we are considering, may be defined as a combination of two or more persons to accomplish by concerted action an unlawful or oppressive object; or a lawful object by unlawful or oppressive means. To sustain an action, damage must have resulted from the combination; to warrant an injunction, damage must be threatened.

And so the inquiry is: (1) Was the object of the agreement unlawful or oppressive? (2) If the object were lawful and free from oppression, were the means unlawful or oppressive?

The direct object or purpose of a combination furnishes the primary test of its legality. It is not every injury inflicted upon third persons in its operation that renders a combination unlawful. It is not enough to establish illegality in an agreement between certain persons to show that it works harm to others. An agreement entered into for the primary purpose of promoting the interests of the parties is not rendered illegal by the fact that it may incidentally injure third persons. Conversely, an agreement entered into for the primary purpose of injuring another is not rendered legal by the fact that it may incidentally benefit the parties. As a general rule it may be stated that, when the chief object of a combination is to injure or oppress third persons, it is a conspiracy; but that when such injury or oppression is merely incidental to the carrying out of a lawful purpose, it is not a conspiracy. Stated in another way: A combination entered into for the real malicious purpose of injuring a third person in his business or property may amount to a conspiracy and furnish a ground of action for the damages sustained, or call for an injunction, even though formed for the ostensible purpose of benefiting its members and actually operating to some extent to their advantage; but a combination without such ulterior oppressive object, entered into merely for the purpose of promoting by lawful means the common interests of its members, is not a conspiracy. A laborer, as well as a builder, trader, or manufacturer, has the right to conduct his affairs in any lawful manner, even though he may thereby injure others. So several laborers and builders may combine for mutual advantage, and, so long as the motive is not malicious, the object not unlawful, nor oppressive and the means neither deceitful nor fraudulent, the result is not a conspiracy, although it may necessarily work injury to other persons. The damage to such persons may be serious—it may even extend to their ruin—but if it is inflicted by a combination in the legitimate pursuit of its own affairs, it is damnum absque injuria. The damage is present, but the unlawful object is absent. And so the essential question must always be whether the object of a combination is to do harm to others or to exercise the rights of the parties for their own benefit.

These principles are well settled by the leading cases upon conspiracies. Thus in the celebrated case of Mogul Steamship Co. v. McGregor, L. R. 21 Q. B. 552, Lord Chief Justice Coleridge said:

"I do not doubt the acts done by the defendants here, if done wrongfully and maliciously. or if done in furtherance of a wrongful and malicious combination, would be ground for an action on the case at the suit of one who has suffered injury from them. The question comes at last to this: What was the character of those acts, and what was the motive of the defendants in doing them?"

And when the Mogul Steamship Case came to the House of Lords (L. R. [1892] App. Cas. 25, 58), Lord Hannen said:

"The question, however, raised for our consideration in this case is whether a person who has suffered loss in his business by the joint action of those who have entered into such an agreement can recover damages from them for the injury so sustained. In considering this question, it is necessary to determine upon the evidence what was the object of the agreement between the defendants and what were the means by which they sought to attain that object. It appears to me that their object was to secure to themselves the benefit of the carrying trade from certain points. * * * I consider that a differ-

ent case would have arisen if the evidence had shown that the object of the defendants was a malicious one, namely, to injure the plaintiff whether they (the defendants) should be benefited or not."

The cases relating particularly to combinations of labor also state the same doctrine. Thus in National Protective Ass'n v. Cumming, 170 N. Y. 315, 328, 63 N. E. 369, 372, 58 L. R. A. 135, 88 Am. St. Rep. 648, Chief Judge Parker said:

"It is only where the sole purpose is to do injury to another, or the act is promoted by malice, that it is insisted that the act becomes illegal. No such motive is alleged in that finding. It is not hinted at. On the contrary, the motive which always underlies competition is asserted to have been the animating one."

And in the concurring opinion in the same case, Judge Gray said:

"The struggle on the part of individuals to prefer themselves, and to prevent the work which they are fitted to do from being given to others, may be keen and may have unhappy results in individual cases; but the law is not concerned with such results, when not caused by illegal means or acts."

In Jacobs v. Cohen, 183 N. Y. 207, 211, 76 N. E. 5, 7, 2 L. R. A. (N. S.) 292, 111 Am. St. Rep. 730, Judge Gray also said:

"Nor does the answer aver that it was intended thereby to injure other workmen; or that it was made with a malicious motive to coerce any to their injury, through their threatened deprivation of all opportunity of pursuing their lawful avocation."

In the same case the judge further said regarding the agreement there in question:

"That, incidentally, it might result in the discharge of some of those employed, for failure to come into affiliation with their fellow workmen's organization, or that it might prevent others from being engaged upon the work, is neither something of which the employers may complain, nor something with which public policy is concerned."

In Mills v. United States Printing Co., 99 App. Div. 605, 612, 91 N. Y. Supp. 185, 190, another New York case, the court said:

"There is a manifest distinction, well recognized, between a combination of workmen to secure the exclusive employment of its members by a refusal to work with none other, and a combination whose primary object is to procure the discharge of an outsider and his deprivation of all employment. In the first case, the action of the combination is primarily for the betterment of its fellow members. In the second case, such action is primarily 'to impoverish and to crush another' by making it impossible for him to work there, or, so far as may be possible, anywhere. The difference is between combination for welfare of self and that for the persecution of another. The primary purpose of one may necessarily but incidentally require the discharge of an outsider; the primary purpose of the other is such discharge and, so far as possible, an exclusion from all labor in his calling. Self-protection may cause incidental injury to another. Self-protection does not aim at malevolent injury to another."

In Vegelahn v. Guntner, 167 Mass. 92, 98, 44 N. E. 1077, 35 L. R. A. 722, 57 Am. St. Rep. 443, Justice Allen said:

"A combination among persons merely to regulate their own conduct is within allowable competition and is lawful, although others may be indirectly affected thereby; but a combination to do injurious acts, expressly directed to another, by way of intimidation or restraint either of himself or of other persons employed or seeking to be employed by him, is outside of allowable competition and is unlawful."

In Allis-Chalmers Co. v. Iron Moulders' Union (C. C.) 150 Fed. 155, Judge Sanborn said:

"The conclusion to be drawn from the cases, as applicable to this controversy, is, I think, that the combination of the defendant unions, their members and the defendant O'Leary, to strike, and further to enforce the strike and if possible to bring the employers to terms by preventing them from obtaining other workmen to replace the strikers, was not unlawful, because grounded on just cause or excuse, being the economic advancement of the union moulders, and the competition of labor against capital."

In Allen v. Flood, L. R. (1898) App. Cas. 1, 164, Lord Shand said:

"Their object was to benefit themselves in their own business as working boiler makers, and to prevent a recurrence in the future of what they considered an improper invasion on their special department of work. How this could possibly be regarded as 'malicious,' even in any secondary sense that can reasonably be attributed to that term, I cannot see."

In Quinn v. Leathem, L. R. (1901) App. Cas. 495, Lord Shand, in speaking of Allen v. Flood, supra, said:

"In that case I expressed my opinion that while combination of different persons in pursuit of a trade object was lawful, although resulting in such injury to others as may be caused by legitimate competition in labour, yet that combination for no such object, but in pursuit merely of a malicious purpose to injure another, would be clearly unlawful; and having considered the arguments in this case, my opinion has only been confirmed."

The principal case relied upon by the complainant (Curran v. Galen, 152 N. Y. 33, 46 N. E. 297, 37 L. R. A. 802, 57 Am. St. Rep. 496) when analyzed will not be found to conflict with the principles just stated. It was held in that case, in substance, that if the prime purpose of a combination of workingmen is to restrict the citizen in pursuing his lawful calling and through contracts with employers to coerce other workingmen to become members of the combination, such purpose is against public policy and renders the combination unlawful, notwithstanding it may possess other features of advantage to its members. As said by the court in its opinion:

"Public policy and the interests of society favor the utmost freedom in the citizen to pursue his lawful trade or calling, and if the purpose of an organization or combination of workingmen be to hamper, or to restrict, that freedom, and, through contracts or arrangements with employers, to coerce other workingmen to become members of the organization and to come under its rules and conditions, under the penalty of the loss of their position, and of deprivation of employment, then that purpose seems clearly unlawful and militates against the spirit of our government and the nature of our institutions."

But the court went on to say that if the organization were for the purpose of promoting the general good of its members, it would not be invalid, and quoted with approval the instructions given to a jury in an English case (Regina v. Rowlands, 17 Ad. & Ellis [N. S.] 671):

"A combination for the purpose of injuring another is a combination of a different nature, directed personally against the party to be injured, and the law allowing them to combine for the purpose of obtaining a lawful benefit to themselves gives no sanction to combinations which have for their immediate purpose the hurt of another. The rights of workmen are conceded; but the exercise of free will and freedom of action, within the limits of the law, is also secured equally to the masters. The intention of the law is, at present, to allow either of them to follow the dictates of their own will, with respect to their own actions, and their own property, and either, I believe, has a right to

study to promote his own advantage, or to combine with others to promote their own mutual advantage."

It is evident therefore that the combination in Curran v. Galen was condemned because its primary purpose was to coerce workingmen to join it; any other objects being merely incidental. As said by Judge Martin in his dissenting opinion in the later case of Park & Sons Co. v. National Druggists' Ass'n, 175 N. Y. 40, 67 N. E. 150, 62 L. R. A. 632, 96 Am. St. Rep. 578:

"As we have already seen, this court in Curran v. Galen unanimously held that a combination or association of workingmen *whose purpose was to hamper or restrict the freedom of the citizen in pursuing his lawful trade or calling*, through contracts or arrangements with employers to coerce workingmen to become members of the organization and to come under its rules and conditions under penalty of loss of their positions and of deprivation of employment, was against public policy and unlawful." (Italics ours.)

And in National Protective Ass'n v. Cumming, 170 N. Y. 334, 63 N. E. 374, 58 L. R. A. 135, 88 Am. St. Rep. 648, already referred to, Judge Gray said:

"The case is not within the principle of Curran v. Galen, 152 N. Y. 33, 46 N. E. 297. 37 L. R. A. 802. 57 Am. St. Rep. 496. Upon the facts of that case, as they were admitted by the demurrer to the complaint, the plaintiff was threatened, if he did not join a certain labor organization, and so long as he refused to do so, with such action as would result in his discharge from the employment and in an impossibility for him to obtain other employment anywhere, and, in consequence of continuing his refusal to join the organization, his discharge was procured through false and malicious reports. affecting his reputation with members of his trade and with employers. There is no such compulsion, or motive, manifest here. There is no malice found. There is no threat of a resort to illegal methods."

Applying the principles which we have thus far ascertained to the facts of the present case, do we find that the object of the defendants in entering into the agreement embracing the clauses in question was to injure the complainant or to benefit themselves?

The object of clause 10 manifestly was to make the stipulations of the agreement generally effective. The mason builders joining in the agreement being bound by its stipulations, it was necessary for their protection that competing outside builders should only employ bricklayers upon the same conditions. So it was for the advantage of the bricklayers themselves to have means for enforcing uniformity in terms of employment.

It also seems clear from the testimony that the object of clause 5 was to benefit the bricklayers. Certainly from their point of view substantial benefits accrue from preventing the installation of fireproofing by separate contractors. Through the operation of this clause the men who do the exposed work secure the easier and safer inside work and more continuous employment than would otherwise be the case. The specialization of the bricklayers' trade through the growth of a class of workmen who would devote themselves to setting fire brick and would, in the end, take all that work from the ordinary bricklayer, is prevented.

It is true that the complainant contends that these advantages are fanciful rather than real, and points out that much of the fireproofing

is laid before the walls. Still it appears that a very large amount of fireproofing is done after the walls are completed, and the contention of the bricklayers that they obtain advantages through the operation of clause 5 in securing different kinds of work and steady employment seems well founded. The complainant also contends that there would be no danger of specialization in the bricklayers' trade should it take separate contracts for installing fireproofing, but the evidence does not support this contention. On the contrary, it indicates that the apprehensions of the bricklayers, as shown upon the record, are not without foundation.

Considering all the testimony, we are satisfied that the direct object of the adoption of the clauses in question was to benefit the parties and not to injure the complainant or other persons in a similar situation. Any particular or special intention to injure the complainant is, of course, negatived by the fact that the clauses in question were inserted in the trade agreement between the parties long before the complainant undertook to do any business in the city of New York.

The object of the agreement being neither unlawful nor oppressive, the next inquiry is whether the means adopted to make it effective were unlawful or oppressive.

As indicated in the statement of facts, no threats or acts of intimidation except in connection with the enforcement of clause 5 are shown. Instances do appear, however, in which bricklayers struck and ceased to work because they claimed that work was being done in violation of this clause. So, statements were made by members of the Builders' Association and of the unions that the complainant would not be permitted to take separate contracts for the installation of fireproofing. It is unnecessary to review the acts of the defendants in detail. We are not satisfied that if the defendants or their representatives made threats, they threatened to do anything which they had no right to do. The object of the agreement was not unlawful. The defendants had the right to strike to secure its enforcement. They also had the right to notify the complainant and persons with whom it had dealings that it could not take contracts for the installation of fireproofing contrary to the terms of the agreement without incurring its penalties. But a threat to do that which a person has the right to do is not unlawful. In National Protective Ass'n v. Cumming, 170 N. Y. 315, 330, 63 N. E. 369, 373, 58 L. R. A. 135, 88 Am. St. Rep. 648, already referred to, the court said:

"They did not threaten to employ any illegal method to accomplish that result. They notified them of the purpose of the defendants to secure this work for themselves and to prevent McQueed and his associates from getting it, and in doing that they but informed them of their intention to do what they had a right to do, and when a man purposes to do something which he has a legal right to do, there is no law which prevents him from telling another who will be affected by his act of his intention."

And in Park & Sons v. National Druggists' Ass'n, 175 N. Y. 1, 20, 67 N. E. 136, 143, 62 L. R. A. 632, 96 Am. St. Rep. 578, it was also said:

"There are no threats alleged in this complaint on the part of defendants to do anything except that which they have a right to do. if the views so far ex-

pressed be sound, and as we said in that case, and it is proper to repeat here, that a man may threaten to do that which the law says he may do, provided that, within the rule laid down in certain cases therein cited, his motive is to help himself."

It therefore follows that the defendants have not entered into a combination to accomplish an unlawful or oppressive object, or a lawful object by unlawful or oppressive means, and are not guilty of a common-law conspiracy.

Finally, the complainant contends that the agreement amounts to a conspiracy under the Penal Code of the state of New York (section 168, subds. 5 and 6). But the principles applicable to conspiracies at common law, which we have considered, apply to conspiracies under the statute. The test of the application of the statute is the purpose of the combination, and if the object and means be lawful, there is no conspiracy, even though a third person may be incidentally injured.

And so the conclusion must be that the Circuit Court was right in dismissing the complaint. Nevertheless it cannot be denied that the complainant has ground for complaining. It desires to engage in a lawful and legitimate business in a lawful and legitimate way and is practically prevented from so doing by the acts of the defendants. Its right to do business in the manner it desires is interfered with, and the law affords it no remedy because such interference is only incidental to the exercise by the defendants of their own right to contract for their own benefit. The complainant is injured, but has no remedy. The law could only make it possible for the complainant to do business in the way it chooses by compelling the defendants to do business in the way they do not choose. But, when equal rights clash, the law cannot interfere.

Decree affirmed, with costs.