## Booker & Kinnaird v. Louisville Board of Fire Under-writers, et al.

(Decided September 17, 1920.)

### Appeal from Jefferson Circuit Court (Chancery Branch, Second Division).

1. Conspiracy—By-Laws of Insurance Board.—By-laws adopted by an association of insurance agents providing that whenever an insurance company represented by a member of the board employed an agent in the city, who was not a member of the board, all members of the board who had been acting as agents for the company should resign their agency; and that members of the association should not receive business from, or place business with, agents who were not members, were not illegal, unreasonable or oppressive as the rights of the public were not in any manner affected or prejudiced by the bylaws.

2. Conspiracy—Rules and By-Laws.—Bodies of men organized and associated together for the purpose of engaging or who are engaged in some legitimate and lawful enterprise may adopt and enforce such just, fair, and reasonable rules as may be needed to promote harmony between the members and advance the best interest of the enterprise in which they are engaged, although the effect of the observance of the rules may be to injure the business of persons who are not members of the association.

3. Conspiracy—Boycott—Rules and Regulations.—Rules and regulations adopted by men acting in concert may be fair and lawful and yet the acts and conduct of the members of the association acting under these rules and regulations may be arbitrary, oppressive and unlawful.

4. Conspiracy—Boycott—Two Kinds of Boycott.—There may be two species of boycotts, primary boycott, that directly relates to the person against whom the boycott is inaugurated, and a secondary boycott that relates to and affects persons dealing with the objectionable party.

5. Conspiracy—Boycott—Definition of Boycott.—A boycott is a refusal of a body of men operating in concert, to work for, buy from, sell to, or have any kind of business dealings with another party, or with persons who deal with him.

6. Conspiracy—Boycott—Lawful Boycott.—Bodies of men organized for the purpose of protecting their own interests may adopt rea-

sonable rules and regulations and may in a quiet, orderly way, when it is necessary to protect or advance the business they are engaged in, refuse to have business dealings with any other person or with those who do business with such persons.

7. Conspiracy—Boycott—Unlawful Boycott.—It is unlawful for two or more persons acting in concert to resort to threats, violence or intimidation, to force any other person to yield to their demands or to engage in a boycott not to promote their own interest, but to injure the business of another.

8. Conspiracy—Boycott—Lawful Boycott—Facts of Cases.—Where the fire insurance agents in a large city organized a board and adopted rules providing that they would not have any business relations with any agent who was not a member of the board or with any insurance company who employed non-board agents, they were not engaged in an unlawful conspiracy or boycott, when in a quiet, orderly way, free from threats, violence, or intimidation, they refused to have any business relations with agents who were not members of the board or with insurance companies who employed agents who were not members of the board, although the effect of this was to seriously injure the business of non-board agents.

9. Conspiracy—Boycott—Secondary Boycott.—Where there is a primary as well as a secondary boycott, the party against whom the primary boycott is inaugurated may have relief in a proper state of case although the persons against whom the secondary boycott was put in effect may not be complaining.

10. Conspiracy—Boycott—When May Be Enjoined.—A conspiracy or boycott in violation of a statute or a contract right may be enjoined.

BASKIN & VAUGHN and TRABUE, DOOLAN, HELM & HELM for plaintiffs.

BLAKEY, DAVIS & LEWIS, SELLIGMAN & SELLIGMAN, ERNEST W. SPRAGUE, HITE H. HUFFAKER and BECKHAM OVERSTREET for defendants.

OPINION OF THE COURT BY CHIEF JUSTICE CARROLL—Overruling motion for injunction asked by plaintiffs.

Many years ago the Louisville Board of Fire Underwriters, a voluntary unincorporated association of fire and tornado insurance agents having no capital stock but charging an admission fee, was organized in the city of Louisville.

The objects of the association are thus stated in its constitution:

"Its objects shall be the promotion of harmony and correct practice in the business of fire and tornado un-

derwriting; the maintenance of established rates and forms of fire and tornado insurance; the regulation and employment of solicitors as to their number and conditions; the adoption of such by-laws and regulations and their enforcement by the imposition of fines, penalties and expulsion for violation as the best interests of fire and tornado underwriting may seem to require; and to do any and all things as in their judgment may redound to the improvement and elevation of the business of fire and tornado insurance.

"It shall have jurisdiction over all fire and tornado business of insurance taken by its members and prescribe a uniform manner of conducting said business."

It is also provided in the Constitution that: "No person shall be eligible for election to membership in this board who does not represent at least two companies (other than local companies) that have no other agent in the city of Louisville (except as hereinafter provided in the constitution or by-laws), and has not an office of his own, and who does not intend and after election shall not be engaged solely in the business of fire and tornado insurance or such other business as the board, after receiving the report of the committee on membership, shall decide not to be in conflict with the fire and tornado insurance business or the interests of other members. "No member of this board shall take the agency of a company which has already two existing agencies in the city of Louisville, except that a company obtaining control of the business (other than that of the retiring company in its home state) by purchase, reinsurance or otherwise of any other company then represented by a member of this board, may continue the business in that agency either in its own name or under any underwriting agency title it may select."

In the by-laws adopted by the association are these provisions:

"A. Members shall not receive business from any company, person or firm engaged in the fire and tornado insurance business, who is a resident of the city of Louisville, and who is not a member of this board.

"Members shall not place business with any one not a member of this board, who is a resident of the city of Louisville, except when instructed by the assured to do so or where the facilities of all companies represented by members of this board, acceptable to the assured,

have been exhausted, and in such cases, shall immediately report in writing to the secretary.

"B.   Whenever a company represented by a member of this board is also represented by an agent not a member hereof, the secretary shall immediately bulletin such fact to all members, and if the non-board representation of said company is not discontinued in fifteen days from date of such bulletin, it shall be the duty of all board members representing such company to immediately resign the agency thereof, unless the terms of limitation shall have been extended by action of the board. Not applicable to automobile floater insurance."

In other by-laws provision was made for the infliction of fines, and the expulsion of members from the board who refused to obey or violated the constitution or by-laws.

There are many other clauses in the constitution and by-laws regulating the business conduct of the association and its members, but the ones quoted are sufficient for the purposes of this case.

In 1902 the plaintiffs, Booker & Kinnaird, fire insurance agents in the city of Louisville, became members of the board and retained their membership in good standing from that time until June, 1920, when the matters now in litigation came up between them and the board and its members.

In March, 1920, the Firemen's Insurance Company of New Jersey, which was then and had been for many years represented in Louisville by Booker & Kinnaird, appointed L. W. Botts of Louisville its agent to solicit and issue policies of fire insurance, and procured a license to be issued to Botts by the state of Kentucky, authorizing him to conduct the business of fire insurance agent for the use and benefit of the Fidelity & Columbia Trust Company, a Louisville corporation, of which Botts was the president. Botts was not a member of the board, and could not under its rules become one because he was not then engaged solely in the business of an insurance agent and did not intend to engage in this business except in connection with his presidency of the trust company.

At the time Botts was appointed an agent for the Firemen's Insurance Company in the city of Louisville the plaintiffs Booker & Kinnaird were also acting and had been for some time as its agent in Louisville. Soon

after the appointment of Botts as agent for this company, the board pursuant to rule B. before quoted demanded of Booker & Kinnaird that they have the Firemen's Insurance Company cancel the appointment of Botts as its agent, or themselves surrender their agency for the company, stating that in the event of the failure of Booker & Kinnaird either to have the agency of Botts cancelled by the company or to resign their own agency they would be subject to the penalties of fine or expulsion as provided in the constitution and by-laws of the board.

When this demand was made of Booker & Kinnaird, they refused to surrender their agency for the Firemen's Insurance Company or to make any effort to have this company cancel the agency of Botts, and to avoid the penalties authorized to be imposed by the constitution and by-laws upon recalcitrant agents they resigned as members of the board, and thereupon brought this suit in the Jefferson circuit court, against the board and the forty-one firms and individual agents who were members of it, seeking an injunction against the board and its members to restrain it and them from combining, conspiring or acting in concert to injure the business of Booker & Kinnaird, as insurance agents, by attempting to enforce against them or the insurance companies represented by them the provisions of the by-laws heretofore set out.

As grounds upon which to rest this prayer for injunctive relief, it was averred in the petition in substance that the board had instructed all of its members that Booker & Kinnaird had resigned from membership in the board and therefore members of the board must on and before a date fixed in the notice discontinue to act as agents for any of the fire insurance companies represented by Booker & Kinnaird; that pursuant to these instructions the board and its members had notified the various companies represented by Booker & Kinnaird that they would no longer represent them as agents or conduct any business for or with them unless on or before the date named they cancelled the agency of Booker & Kinnaird. It was further averred that under the provisions of the by-laws before quoted the board and its members were forbidden to have any business dealings whatever with Booker & Kinnaird in connection with the subject of fire insurance, and were forbidden to place any insurance with them or write any insurance obtained

by them, and thus, the board and its members, acting in concert, had through the agency of the board established and enforced an unlawful boycott against Booker & Kinnaird, and also against the companies represented by them as agents unless such companies should on or before the date named cancel the agency of Booker & Kinnaird; that the effect of this boycott if carried out would be to destroy the business of Booker & Kinnaird by taking from them the agencies of the insurance companies they represented.

They further averred that as a result of the efforts of the board and its members, two companies represented by them had withdrawn their agency, and other insurance companies for which they were acting as agents had notified them that they would be compelled to cancel their agency; that they had built up a large and valuable business as insurance agents, which business the board and its members would and could destroy by the enforcement of the by-laws of the board against them and the insurance companies they represented. It was further averred that the acts and conduct of the board and its members in taking the course set out amounted to an unlawful combination, conspiracy and boycott to injure and destroy their business and that they did not have any adequate remedy at law.

The prayer of the petition was that the defendants herein, individually and collectively, jointly and severally, be enjoined and restrained from combining or conspiring or acting in concert, either under color of the constitution and by-laws of the Louisville Board of Fire Underwriters or under any other alleged claim or pretext, to injure the business of these plaintiffs as insurance agents by attempting or pretending to enforce against these plaintiffs, or against any fire insurance companies represented by these plaintiffs, the illegal boycott or conspiracy provided for in sections A and B of the by-laws or from proceeding to effectuate said unlawful boycott and conspiracy against these plaintiffs by enforcing the said sections of the by-laws against any of the members of the board or the defendants herein.

Thereafter the board and its members filed an answer putting in issue the material averments of the petition.

The case coming before the Honorable Samuel B. Kirby, judge of the Jefferson circuit court, upon the

pleadings, exhibits and evidence introduced, he refused to grant the injunction prayed for, and Booker & Kinnaird have bruoght the case before me, asking that I issue the writ refused by Judge Kirby.

Summarizing briefly the evidence heard before Judge Kirby it may be said to show (1) that the proposed action of the board would seriously injure the business of Booker & Kinnaird on account of their inability to retain the agencies they had except for three companies, or secure the agency for other companies as nearly all of the large companies prefer to have agents who are members of the board; (2) that all of the insurance agents in the city of Louisville, with the exception of one firm, are members of the board, and all of the companies doing business in the city, excepting the few represented by this non-board agency, are represented by board agents; (3) that in all of the large cities of the country there are boards with purposes, functions and powers substantially similar to the Louisville board, and also a national board of which these local boards are members or with which they affiliate; that the insurance companies are favorable to the organization and maintenance of these boards, and prefer to do business with agents who are members of them; (4) that there is active competition in the insurance business between the members of the board; (5) that any reputable person who desires to become an insurance agent and is willing to subscribe to the constitution and by-laws of the board may become a member of it; (6) that Booker & Kinnaird could remain members of the board if they resigned their agency of the Firemen's Insurance Company or prevailed on it to cancel the agency of Botts; (7) that during the long existence of this board it has performed a useful service to insurance companies, to agents and the insuring public, by promoting harmony, honest dealing, and fair methods in the conduct of the insurance business; (8) that neither the board nor its members have in any manner attempted except in the enforcement of the by-laws mentioned to interfere with the business of insurance companies or non-board agents, nor do the members of the board entertain any feeling of hostility towards Booker & Kinnaird either as agents or individuals nor have they attempted to do them any injury except in so far as the enforcement of the by-laws might have that effect; (9)

that neither the board nor its members put in circulation any slanderous reports or libelous publications against nor did they employ any coercive methods toward Booker & Kinnaird or the insurance companies represented by them other than such as might follow the enforcement of the by-laws, or resort to any methods of force, violence or intimidation in their effort to prevail on Booker & Kinnaird or the companies represented by them to observe the by-laws of the board; (10) that none of the companies that were represented by Booker & Kinnaird are complaining of the action of the board or its members; (11) that when Booker & Kinnaird refused to comply with the by-laws as stated, the board notified the various companies represented by them that its members would not have any further business dealings with them as long as Booker & Kinnaird were acting as their agents; (12) that the members of the board in taking this action were only doing what they believed to be necessary to protect their own interests as insurance agents; (13) that the rights of the insuring public will not in any manner be affected by the enforcement of the rules against Booker & Kinnaird as the board has no power whatever to fix or regulate insurance rates, this power being lodged exclusively in the state insurance department.

Upon these facts it is the contention of counsel for Booker & Kinnaird that by-laws A and B are illegal, unreasonable and arbitrary and the effort of the board and its members to enforce them amounted to an unlawful conspiracy and combination to destroy the business of Booker & Kinnaird and was in effect an unlawful boycott against them.

On the other hand the argument on behalf of the board and its members is that the by-laws in question are fair and reasonable business regulations and in their enforcement the board and its members are only doing what they believed to be necessary to preserve the existence of the board and protect the interests of the members as insurance agents.

I have thought it well to set out with care the pertinent parts of the constitution and by-laws of the board, and the material evidence on the hearing before Judge Kirby, as well as the contentions of the parties, so

that the decision may be confined strictly to the legal meaning and effect of the by-laws and evidence.

This statement of the scope of the opinion I am influenced to make because in cases involving questions like the ones here presented, and that are constantly coming up, the line that separates legitimate and lawful concert and combination and unlawful and prohibited concert and combination in business affairs is often a very narrow one, thus making it important to confine the conclusion of law to the facts of each particular case, so that the difficulty frequently arising in attempts to distinguish close cases may be obviated as much as possible.

In considering the case the first question to be determined is the legality of the by-laws which are attacked and that provide in substance that whenever an insurance company represented by a member of the board employs an agent in the city of Louisville who is not a member of the board, the secretary of the board shall notify all members of that fact, and thereupon the board members representing the offending company shall resign its agency; that board members shall not receive business from or place business with agents who are not members of the board. In others words, these by-laws oblige members of the board to confine their insurance business to companies who have board agents, and forbids members to give to or accept insurance business from non-board agents, and thereby limits the business rights that agents who are members of the board might exercise if they were not members.

But I do not think these by-laws are open to any legal objection or operate as an unlawful restraint of trade. Bodies of men organized and associated together for the purpose of engaging, or who are engaged, in some legitimate and lawful enterprise, may adopt and enforce such just, fair and reasonable rules and regulations as may be needed to promote harmony between the members and advance the best interest of the enterprise or business in which they are engaged, although the effect of such rules and regulations may be to limit the freedom of action that the members might enjoy if they were not connected with the association and the further effect may be to injure the business of some other party.

Upon this point it was said in Louisville Board of Fire Underwriters v. Johnson, 133 Ky. 797, a case in

which the court had under consideration the validity of the by-laws of this board, that: "It will readily be seen that to deny business bodies the right to adopt and enforce reasonable rules and regulations for the government of its members in the transaction of business would seriously impair, if not destroy, the usefulness of numerous organizations that have been created for business purposes, and that impose such reasonable restrictions upon the membership as in the judgment of the majority are necessary and proper to preserve and promote the purposes of these organizations, many of which are accomplishing great good by reason of the salutary rules they have adopted, and which their members are obliged to observe under pain of expulsion or other punishment. And so it is generally held by courts that voluntary and other associations may adopt reasonable rules for the government of their members and enforce compliance with them.

"Every business organization, society or association restricts in more or less degree, the rights of its members, and if these bodies were not allowed to do this, there would be small use for organization. No beneficial results could follow from union if every member was left to do as he pleased, or these bodies were not permitted to enforce, by appropriate fines and penalties, the reasonable regulations they have adopted. . . . All of these organizations have rules that restrict the individual, and require him to do things that he may not desire to do, and especially in industrial bodies and labor unions, do these rules operate as a partial restraint of trade in the sense that, among other things, they prescribe the number of hours a man may work, the persons for whom he may work, the wages or compensation that shall be received; but, it is generally held that so long as these regulations are reasonable when applied to the individual, and do not injuriously affect the public, they will be upheld."

To the same effect are Bossert v. Dhuy, 221 N. Y. 342, Ann. Cas.; 1918D 661; McCauley Bros. v. Tierney, 19 R. I. 255, 37 L. R. A. 455; Bohn Mfg. Co. v. Hollis, 54 Minn. 223, 21 L. R. A. 337; J. F. Parkinson Co. v. Building Trades Council, 154 Cal. 581, 21 L. R. A. (N. S.) 550; Gill Eng. Co. v. Doerr, 214 Fed. 111; State v. Van Pelt, 136 N. C. 663, 68 L. R. A. 760; L. D. Willcut & Sons Co. v. Driscoll, 200 Mass. 110, 23 L. R. A. (N. S.) 1236.

Having determined that the by-laws are not unreasonable, arbitrary, oppressive or illegal, the remaining question is: were the acts done by the members of the board under and by virtue of them oppressive or unlawful? If they were, relief may be granted because, although the rules and regulations by which men acting in concert are governed may be unobjectionable, and their organization formed for a lawful purpose, their acts and conduct in attempting to accomplish the purposes intended by the rules may be unreasonable, oppressive and wrongful.

I have said that the evidence shows that the action of the board if not restrained would seriously injure the business of Booker & Kinnaird; and, taking this for granted, their counsel urge that what the board and its members propose to do is an unlawful trade boycott, both in a primary and a secondary sense—primarily in so far as it directly affects and relates to Booker & Kinnaird, and secondarily in so far as it affects and relates to the insurance companies for whom Booker & Kinnaird have been acting as agents.

The law recognizes what may be called two species of boycotts. One a primary boycott that is applied directly and alone to the offending person, by withdrawing from him all business relations on the part of the organization that initiated the boycott, and the other a secondary boycott that becomes effective when the members of the organization refuse to have any business relations with persons dealing with the offender until he has yielded to the demands of the organization. It will thus be seen that there is presented in this case both species of boycott—one against Booker & Kinnaird, and the other against the insurance companies represented by them, unless they cancel the agency of Booker & Kinnaird.

In this connection it may be repeated, that the insurance companies for whom Booker & Kinnaird have been acting as agents, and who were notified by the board that they must cancel their agency or else members of the board would have no business relations with them are not complaining of the action of the board. On the contrary, all of them except three who have indicated their purpose to remain with Booker & Kinnaird appear to acquiesce in the action of the board and be satisfied with the enforcement of its rules, and accord-

ingly will cancel the agency of Booker & Kinnaird. I do not, however, regard the failure of these insurance companies to object to or complain of the action of the board as depriving Booker & Kinnaird of the right to assail as unreasonable, oppressive and unlawful the concerted action taken by the members of the board in severing business relations with insurance companies who employ Booker & Kinnaird, because this is only one method adopted by the members for the purpose of injuring their business; and if the by-laws were unlawful in any of their parts, so much thereof as prohibited members of the board from dealing with insurance companies who employed Booker & Kinnaird would be equally as objectionable as that part of the by-laws that prohibits members from having business relations with Booker & Kinnaird.

It is true that the members of this board are not permitted under the by-laws to give business to or accept business from agents who are not members of the board, or to have business relations with insurance companies represented by agents who are not members. But no reputable agent has ever been denied membership. Nor has threat, intimidation, violence or force been resorted to in an effort to force insurance companies to secure board members as agents, or to compel agents not members of the board to become members. Nor has there been any interference with or obstruction of the business of any insurance company or its agents, except in so far as was authorized by the strict letter of the by-laws. Nor will the enforcement of the by-laws be prejudicial to the public interest as the members of the board are amply able to give the public good service, and have no power to fix or regulate rates.

In short, the only offense charged against the board and its members is that the members have agreed among themselves that they will not give business to or accept business from any agents who are not members of the board, or have business relations with insurance companies that are not represented by members of the board.

Under these circumstances, if the board is an unlawful combination or conspiracy, and the conduct of the members in observing the by-laws amounts to an unlawful boycott, there could be no lawful association of persons in any business for the purpose of promoting and protecting business interest. If an association of

persons could not lawfully agree that they would not have business relations with persons whom they considered objectionable or who were engaged in business competition with them, it is plain that no association could be organized that would serve any useful purpose in the promotion and protection of its members.

Of course, every association or organization of persons for the purpose of protecting their business interest may injure in a business way some other person or persons coming in competition with them, and may even go so far as to totally destroy the business of competitors. But these conditions, which are constantly arising in the commercial life of the country, furnish no reason for denying to persons the right to associate and combine in furtherance of legitimate business in which they are engaged or to improve their conditions in a personal or business way.

In almost every profession and every business, there are associations or lodges or boards organized by persons engaged in particular lines of industry or following certain professions, that have for their sole purpose the protection and promotion of the best interest of the business or profession in which they are engaged. And bodies like these, acting in a collective capacity, may in a quiet, orderly way when their interests demand it, refuse to deal with or have any business relations with any other person or persons they choose, although the effect of such combined action is to boycott the objectionable person, very much in the same way as the boycott put into effect in this case against Booker & Kinnaird.

But this character of boycott does not fall under the condemnation of the law. If it did, no persons acting in concert for their own benefit could refuse to have business relations with or terminate their existing business relations with persons they have theretofore transacted business with.

The word "boycott" is defined in the Century Dictionary to mean:

"To combine (a) in refusing to work for, buy from, sell to, give assistance to, or have any kind of dealings with, and (b) in preventing others from working for, buying from, selling to, assisting, or having any kind of dealings with (a person or company), on account of political or other differences, or of disagreements in busi-

ness matters, as a means of inflicting punishment, or of coercing or intimidating.

"An organized attempt to coerce a person or party into compliance with some demand, by combining to abstain and compel others to abstain, from having any business or social relations with him or it; an organized persecution of a person or company as a means of coercion or intimidation, or of a retaliation for some act, or refusal to act in a particular way." See further Words and Phrases; Bouvier's Law Dictionary, and Cooley on Torts, vol. 2, p. 602.

A boycott is commonly understood by the people and is generally spoken of in the law as an unlawful thing, and this, because the ordinary trade boycott of large bodies of men, is usually accompanied by acts of violence, threats, or intimidation; but I think it clear that under this definition, which seems to cover all the elements of a boycott, there may be a lawful as well as an unlawful boycott, depending on the purpose and intention with which the boycott is inaugurated, the means and methods employed, and the ends intended to be accomplished by its existence.

Illustrations of lawful boycotts are seen everywhere in the every day affairs of life, and in connection with all professions and businesses, in the refusal of persons and bodies of persons to work for, buy from, sell to, or have any kind of dealings with certain other persons, and yet it would hardly be contended that such persons would be liable to either a criminal prosecution or a civil action on account of such refusal, assuming that it was based on business reasons and free from fraud, oppression, violence or force.

It is reckoned as one of the inalienable rights of the individual that he may trade and traffic with and render service for any person he please, and may also unless restrained by voluntary contract quit doing either whenever it suits his pleasure or convenience.

It is also generally held that any number of persons, no matter in what business, service or profession they are engaged, have a lawful right, unless restrained by statute or contract, to organize, unite, and combine for the advancement of their own interest or to protect some legitimate enterprise or business in which they are engaged, and acting in concert to suspend or abandon entirely in a quiet, orderly way their business relations with

any other person, although such action may work serious injury to the other person. But, on the other hand, if the suspension or abandonment of such relations violates a statute or some contract right, or is pursuant to an arrangement, agreement or conspiracy entered into for the sole purpose of injuring or destroying the business of the other person, then it becomes unlawful and may be prohibited.

Fully supporting this statement of the law are the following cases: Brewster v. Millers Sons 'Co., 101 Ky. 368; Leech v. Farmers' Tobacco W. Co., 171 Ky. 791; Van Horn v. Van Horn, 52 N. J. Law, 284, 10 L. R. A. 184; Doremus v. Hennessy, 176 Ill. 608, 43 L. R. A. 797; Boutwell v. Marr, 71 Vt. 1, 43 L. R. A. 803; Purlington v. Hinchliff, 219 Ill. 159, 2 L. R. A. (N. S.) 824; Cohn & Roff Elec. Co. v. Bricklayers Union, 92 Conn. 161, 6 A. L. Rep. 887; Jackson v. Stanfield, 137 Ind. 592, 23 L. R. A. 588; Lohse Pat. Door Co. v. Pfulle, 215 Mo. 421, 22 L. R. A. (N. S.) 607; Bohn Mfg. Co. v. Northwestern L. Assn., 54 Minne. 223, 21 L. R. A. 337; Ertz v. Produce Ex., 82 Minne. 173, 48 L. R. A. 90; Employing Print. Club v. Dr. Blosser Co., 122 Ga. 509, 69 L. R. A. 90; Martell v. White, 185 Mass. 255, 64 L. R. A. 260; McCauley v. Tierney, 19 R. I. 255, 37 L. R. A. 455; J. F. Parkinson Co. v. Builders Trade Council, 154 Cala. 581, 21 L. R. A. (N. S.) 550; National Fire Proofing Co. v. Mason Builders Assn., 169 Fed. 259, 26 L. R. A. (N. S.) 148; Pickett v. Walsh, 192 Mass. 572, 6 L. R. A. (N. S.) 1067; National Pro. Assn. v. Cummin, 170 N. Y. 315, 58 L. R. A. 135; Bossert v. Dhuy, 221 N. Y. 342, Ann. Cas., 1918D, 661.

It is equally well settled by the authorities that it is unlawful, although there may be no statute on the subject, for two or more persons, acting in concert or combination, to resort to force, intimidation, threats or violence, for the purpose of securing the accomplishment of the objects they have in view, although they may in good faith believe that methods such as these are necessary to promote or protect their interest or to engage in a boycott not to promote their own interest or protect the legitimate business in which they are engaged but to injure the trade or business of some other person.

Authorities supporting this principle are Auburn Drey. Co. v. Wardell, 227 N. Y. 1, 6 A. L. Rep. 901; there is a valuable note to this case on the subject of boycott;

Local Union No. 313 v. Stathakis, 135 Ark. 86, 6 A. L. Rep. 894; Haverhill Strand Thea. v. Gillen, 229 Mass. 413, Ann. Cas. 1918D, 651; Longshore Print. & Pub. Co. v. Howell, 26 Ore. 537, 28 L. R. A. 464; Beck v. Railway T. Union, 118 Mich. 497, 42 L. R. A. 407; Gray v. Bldg. Trades Council, 91 Minne. 171, 63 L. R. A. 753; My Maryland Lodge v. Adt, 100 Md. 238, 68 L. R. A. 752; George Jonas Glass Co. v. Glass Bottle Blowers Assn., 77 N. J. Eq. 219, 41 L. R. A. (N. S.) 445; Willcutt & Sons Co. v. Driscoll, 200 Mass. 110, 23 L. R. A. (N. S.) 1236; Arthur v. Oaks, 63 Fed. Rep. 310, 25 L. R. A. 414.

Many other cases might be referred to, sustaining the views set forth in this opinion, but I deem it unnecessary to cite them because there is really no conflict in the authorities concerning the correctness of the rules stated.

The Congress of the United States, as well as many state legislatures, have enacted statutes regulating and defining unlawful trusts, conspiracies and combinations, and a great many cases can be found construing these statutes in controversies involving trade boycotts, inaugurated for the purpose of enforcing the demands of organized bodies; but, as these cases are not particularly pertinent to the matter in hand, it will be sufficient to merely refer to some of the leading ones by their style. Grenada Lumber Co. v. State of Mississippi, 217 U. S. 433, 54 L. Ed. 826; Montague & Co. v. Lowry, 193 U. S. 38, 48 L. Ed. 608; Gompers v. Bucks' Stove & Range Co., 221 U. S. 418, 55 L. Ed. 797; Eastern States Retail Assn. v. United States, 234 U. S. 600, 58 L. Ed. 1490; Purvis v. Local No. 500 Brotherhood, 214 Pa. 348, 12 L. R. A. (N. S.) 642.

Upon the whole case, it would appear that under the by-laws and their enforcement by the members, Booker & Kinnaird were left free to exercise their election to surrender the agency of the Fireman's Fire Insurance Company and resume membership in the board, or continue as agents for this company and conduct their business independently of the board. No threat, coercion, compulsion or force was used to bring them to this election, other than the refusal of the board members to have any business relations with them unless and until they returned to the board, which they may do upon surrendering the agency for this company.

Booker & Kinnaird have preferred to remain outside of the board and compete with its members, while at the same time insisting that the members shall resume business relations with them. In brief, it would appear that Booker & Kinnaird want to force the board members to renounce the board rules and regulations and deal with them, while the board members prefer to stand together and have no business relations with Booker & Kinnaird. As I look at it, each of the parties is within their legal rights—one, in refusing to leave the board; the other, in refusing to return to it; and, neither has any legal cause for complaint against the other.

As to the insurance companies that will cancel the agency of Booker & Kinnaird, as well as those that will remain with them, it may be said that they are free to do as they please. The proposition has been put to them to employ board or non-board agents, as they choose. No pressure, compulsion or force has been exerted against them, except in the attitude of the board members in refusing to transact business for them if they employ non-board agents. In other words, the insurance companies have no just cause for complaint against the board or its members, and, as I have said, are not making any.

It is also very clear that if the relief should be granted, the effect would be to deny the members of the board the right acting in concert to enter into any quiet, orderly agreements or arrangements permitting them to refuse to have business relations with other insurance agents not members of the organization, or such relations with insurance companies not represented by members. The further effect would be to take from the members the right to expel any member who refused to observe the by-laws of the board, and the inevitable effect of all this would be the destruction of the board in so far as its usefulness as a business organization was concerned.

For the reasons set forth, I am of the opinion that Judge Kirby was right in refusing the injunction, and the motion to grant it is overruled.

Judges Thomas, Clarke and Quin considered this case with me, and concur in the opinion and the conclusion reached.