[No. 25637. *En Banc.* November 8, 1935.]

SAFEWAY STORES, INC., *Appellant,* v. RETAIL CLERKS' UNION, LOCAL No. 148, *et al., Respondents.*[1]

*Ryan, Askren & Ryan,* for appellants.

*Vanderveer & Bassett,* for respondents.

*Harroun, Maloy & Shidler* and *L. Presley Gill, amici curiae.*

MITCHELL, J.—The plaintiff, Safeway Stores, Inc., is engaged in the retail grocery and meat market business in Kelso and Longview. The defendant Retail Clerks' Union, Local No. 148, at the commencement of this action was, and still is, engaged as a clerks' union in the two cities. The defendants Hunter and Wessel were, respectively, president and secretary of the Local No. 148 at the date of the commencement of the action. The action was brought for a tempo-

[1]Reported in 51 P. (2d) 372.

rary injunction and for a final or permanent injunction against defendants picketing plaintiff's places of business, and to recover judgment for damages.

In substance, it is alleged in the complaint, which was made and filed June 27, 1934, (1) that the plaintiff is a corporation of Nevada, licensed to do business in this state; (2) that it has two stores in Kelso and two stores in Longview; (3) that Retail Clerks' Union, Local No. 148, is engaged as the clerks' union in the two cities, and that Hunter and Wessel are, respectively, president and secretary of Local No. 148.

(4) That, for some months prior to June 23, 1934, acting through its members and its organizer, one Leach attempted to organize all of the clerks in the two cities into one union and, to accomplish that purpose, approached the managers of certain stores belonging to plaintiff in the two cities in an attempt to cause all of the employees in plaintiff's stores to join Local No. 148; (5) that none of the employees, so far as plaintiff is aware, are members of Local No. 148, but all are receiving wages as high or higher than salaries provided by the National Recovery Act, and all are employed not longer hours than provided in that act; (6) that the plaintiff has at no time questioned or advised any of its employees concerning affiliation with Local No. 148, or any other union organization, and has taken no part in the question of whether any of its members should belong to Local No. 148, and as far as plaintiff knows, all its employees are satisfied with their hours of labor and their compensation.

(7) "That notwithstanding the fact that there has been no controversy between this plaintiff corporation and the defendant Local No. 148 or any of its officers or members, the said union and its members and officers acting in concert and in conspiracy to injure and to damage the plaintiff's businesses in the cities

of Longview and Kelso, Washington, did on the morning of Saturday, June 23rd, 1934, place and post pickets in front of each of said stores in Longview and Kelso; that said pickets wear banners of the kind known as 'sandwich picket banners' which bear upon the front, as well as upon the reverse, words stating that the store in front of which they are parading is unfair; that said pickets begin their labors between 9:30 and 10:30 A. M. and are changed every three or four hours; that said pickets spend practically all the time directly in front of the entrance of plaintiff's places of business, to the annoyance of patrons coming to said places of business to trade and to the injury of the business of plaintiff; that said picketing has continued ever since the 23rd day of June, 1934, and continues to this date. That said pickets talk to said prospective customers and to customers leaving plaintiff's places of business, and that said pickets have diverted and will continue to divert business away from plaintiff's places of business and will unless restrained by the Court continue their illegal operations, all to the irreparable damage and injury of the plaintiff.''

(8) That defendants are insolvent and unable to respond in damages for the amount of loss they have caused, and will continue to cause, plaintiff, and that plaintiff has no adequate remedy at law, nor otherwise, than in a court of equity; (9) that plaintiff has been damaged by the defendants in the sum of five thousand dollars, and will continue to be damaged by them if permitted to continue their picketing.

(10) ''That the defendants' sole purpose in picketing plaintiff's places of business is to compel the employees of the plaintiff to join said Local No. 148 and become members of said union. That this plaintiff has no control over its employees as to whether they shall or shall not join said union and it is unfair and inequitable to permit the defendants to divert business from the plaintiff and to damage and injure its businesses in their attempt to force employees of plaintiff to join said Local No. 148.''

(11) That plaintiff cannot compute with the accuracy required by law the damage defendants have caused and will cause in the future.

The defendants answered jointly on July 11, 1934, alleging in effect: (1) They deny on information and belief the allegations in paragraph 1 of the complaint. (2) They admit the allegations in paragraph 2 of the complaint. (3) They admit the allegations in paragraph 3 of the complaint, including the allegation that Hunter and Wessel were president and secretary of Local No. 148 at the commencement of the action, but allege that they were not such officers at the date of the answer. (4) They admit the allegations in paragraph 4 of the complaint. (5) They deny the allegations in paragraphs 5 and 6 of the complaint.

(6) "They deny that no controversy existed between the plaintiff corporation and the defendants, but to the contrary allege that the defendants have been not only hampered in seeking to organize the clerks in the several establishments in controversy in this action, but have been denied the privilege and a continual dispute between plaintiff and defendants has existed ever since the organization of Retail Clerks' Union, Local No. 148; defendants further admit that they have advertised the unfairness of the plaintiff corporation's stores by banners stating such unfairness, said banners being carried by persons known as sandwich banners, but further deny that such advertising annoyed any of plaintiff corporation's patrons and further deny that said persons carrying the banners heretofore specified, talked to the customers or patrons of plaintiff's and that such advertising has diverted any business from plaintiff's places of business to the damage of plaintiff."

(7) They deny the allegations in paragraphs 8 and 9 of the complaint. (8) They deny the allegations in paragraphs 10 and 11 of the complaint.

An application for a temporary injunction resulted

in a denial of relief, and thereafter, as before, picketing continued until the date of the final hearing on the merits October 11, 1934.

The finding, conclusion and judgment signed and entered in the cause are as follows:

"This matter having come regularly on for hearing before the court upon this 11th day of October, 1934, both sides having announced themselves ready for trial, and the plaintiff being represented by its attorneys, Ryan, Askren & Ryan, and the defendants being represented by their attorney, E. H. Kohlhase, and both sides having offered evidence and rested and having thereupon argued the matter to the court and the court having taken the matter under advisement and being fully satisfied in the premises, the court finds that the plaintiffs have suffered damages in the sum of $2,200 during the period that said picketing has been going on in front of the stores in Kelso and Longview, but is of the opinion that under the laws of the State of Washington and more especially Chapter VII of the Session Laws of 1933, relating to picketing, that the plaintiff is not entitled to any relief,

"Now, therefore,

"It Is Ordered and Adjudged, that the above entitled action be and the same hereby is dismissed to which ruling the plaintiff excepts and its exception is allowed.

"Done in open court this 27 day of October, 1934."

The plaintiff has appealed.

According to a memorandum opinion of the trial court, the theory of the respondents in their defense, approved by the finding and judgment of the trial court, was that the case is controlled by certain portions of chapter 7, Laws Ex. Ses. 1933, p. 10, Rem. 1935 Sup., § 7612-1 [P. C. § 3467-21] *et seq.* Upon referring to certain facts and evidence, the memorandum opinion says:

"This resulted in the defendant Union placing pickets in front of the plaintiff's places of business

in the said cities and the question presented to the court at this time is whether or not there is a labor dispute within the meaning of Chapter Seven of the Session Laws of 1933 relating to such matters. Section 4 of this Act reads:

" 'Sec. 4. No Court of the State of Washington shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute or prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts: . . . (e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;'

"A 'labor dispute' as defined by Section 13 of this Act so far as the same applies to this case, reads:

" 'Sec. 13. . . . (c) the term "labor dispute" includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.' "

The appellant contends that there was, or is, no labor dispute between the parties under the act or at all.

The evidence is singularly free from conflict.

Glenn Silverthorne, manager of the Pay'n Takit store in Kelso, after testifying that daily picketing commenced on July 25, 1934, and that the picketing was confined to the fifty feet immediately in front of the entrance to the store, causing a substantial decrease in business, further testified as follows:

"Q. Had you prior to that time had any trouble with the retail clerks union? A. No trouble. Q. At that time was there any dispute between you and them over a question of hours or labor or rates of pay?

A. No, sir. Q. Were the rates of pay and hours of labor in conformity with the N. R. A.? A. They were. Q. In some instances was the rate of pay by your stores higher than were required by the N. R. A.? A. Yes. Q. Had you ever had any dispute of any kind with your men or your employees as to their joining or not joining unions? A. No, sir. Q. Have you ever advised them not to join the union? A. No, sir. Q. Have you ever advised them to join unions? A. No, sir. Q. Have you kept aloof from the question whether or not they should join, or not join? A. That is right. The men I have in the store have never been approached by the union, and the men say themselves they would rather be transferred or quit, than to join the union. Q. What I wanted to get at was you had never taken any part with your men whether or not they should join the unions? A. No, sir. Q. Was it the policy of your company, as far as you know, to prevent them from joining the union? A. No, sir, it is not; we have in our house organ published each month, a letter by Mr. Skaggs—Objected to by Counsel for Defendant, and moved that the answer be stricken. By Counsel for Plaintiff: No objection. The Court: It will be stricken. Q. Do you know of your own knowledge that you have never received information indicating to you there is any requirement, or any attitude against the men joining, or not joining the union? A. There is not. It is a free country.''

On cross-examination, he further testified:

''Q. You say that you have never had any trouble with a labor union? A. No, sir. Q. Did you have any conversation with any representative of the union? A. Yes. Q. What was that about? A. Mr. Leach just approached me in reference to my men joining the union. That was up to them and not for me to say. Q. You just told him it was up to the men? A. Yes. Q. Did you tell him he could interview the men in your store? A. Yes, and see Mr. Slater about it. Q. You never took any part in it at all? A. No, sir. Q. Never talked to them on the subject? A. No, sir. Q. Never were interested in any manner, shape or form?

A. No, sir. Q. How long have you been with Safe-way? A. Approximately eight years. . . . Q. You say you told Mr. Leach to go and talk to the men? A. I advised him to see Mr. Slater. Q. Who is Mr. Slater? A. He is the supervisor. Q. Supervisor for this district? A. Yes. Q. That ended the matter with you? A. So far as I was concerned."

T. F. Costello, manager of appellant's store in Longview, testified to the same effect as did Mr. Silver-thorne, adding further, on cross-examination, the fol-lowing:

"Q. You say you never had any instructions from the company regarding the affiliation of your men with the local union? A. No, sir. Q. Did you ever have any discussion regarding that matter with any of the union people? A. Yes, Mr. Leach talked to me. I think Mrs. Henderson did at one time. Q. You did not tell them that your men could not join the union? A. No, sir. Q. What did you tell them? A. I referred Mr. Leach to Mr. Slater, and Mrs. Hen-derson talked to me and she started to talk to the boys and I asked her to make an appointment with the boys some time when they were not on duty. Q. Who is Mr. Slater? A. Our supervisor. Q. How did you come to tell him to go to Mr. Slater about that? A. Well, I thought it is a matter I have nothing to say about."

B. A. Shellhart and S. L. Hearing, managers of the other stores, one in Kelso and another in Longview, testified to the same effect as the other two witnesses.

A. J. Slater testified that he was supervisor over the managers of ten stores belonging to the appellant. He further testified:

"Q. As such have you ever advised any of them against those men in those stores joining the unions or not joining the unions? A. No, sir. Q. Have the positions of the men in the stores been dependent in any way upon whether or not they do or do not join the union? A. No. Absolutely not. Q. Have you had

prior to the twenty-third day of June, the day when picketing began in front of the stores, have you had controversy with the retail clerks union No. 148? A. Prior to the picketing? Q. Had you had any controversy, or was there any issue between you? A. Why, the only conversation I had was a grievance committee, I believe, they called it, a committee that was sent to me, and I told them it was entirely up to the men. Q. What? A. I told them it was entirely up to the man; they had to contact them. Q. I mean, there was no dispute between you and they at that time over the question? A. Oh, no. Q. Or anything of that kind? A. No, sir. Q. No formal demand had ever been made upon you that you should do this or should do that? A. No, sir. Q. You said you had not prior to that; Have you since that advised the men whether they should or should not join the union? By Counsel for Defendant: He has answered. The Court: He may answer. A. No, I have not."

On cross-examination, he further testified:

"Q. You say you have never talked to the representatives of the union, that is, the retail clerks' union? A. Never have. Q. You however said you had talked to some one with regard to it? A. This was a committee from the Central Labor Council, and they were not members of the retail clerks union. Q. It was a grievance committee from the Central Labor Council? A. Yes. Q. What was the conversation with them? A. It has been about, oh, it has been three or four months ago, and as I remember it they asked me if I had any objections to our employees belonging to the retail clerks union and I told them no. They asked me if I would help solicit the employees, and I told them if in my capacity I would go to employees asking them if they would like to join the retail clerks union, they might think it was the wish of the company and figure they had to join to save their jobs; so I told them I would not enter into that at all and would not wish to decide, that is up to you,— it made no difference to us. Then he asked me if I had ever talked to the delegate from the retail clerks union, and I said I had not. He said 'Would

you talk to him if he comes around?' and I said I would be glad to, but I never saw him after that. Q. Mr. Silverthorne and Mr. Shellhart and Mr. Hearing told you about the attempt to solicit the men and to join the union? A. Yes. Q. You talked to them about it, the managers of your stores running here? A. Yes. Q. They told you that the representative had been there? A. Yes. Q. And also told you that they had referred them to you? A. That is right. Q. You knew they wanted to see you? A. Yes. Q. Did you ever make any effort to connect with them in any way regarding the matter? A. Why, no. Q. Never wrote to them? A. No. Q. Never telephoned? A. No. Q. Never sent anybody to them to state to them you would be ready to discuss the matter with them? A. I thought that was their place to come to me. They had something to sell. Q. I asked, you never made any effort to contact them? A. No, I made no effort to contact them. Q. Personally, you do not know of any dispute or misunderstanding or trouble between labor, or the retail clerks union, and your corporation? A. No, sir. Q. None whatever? A. No, sir.''

Arthur George Leach, of Kelso, respondents' witness, district organizer of the American Federation of Labor, testified as follows:

''Q. In that capacity did you have any occasion to see the managers of the Safeway and Pay'n Takit stores with regard to soliciting their help to join the retail clerks' local? A. Yes. Q. Tell the court what happened or how it came about? A. I had made several visits to the different stores and interviewed the managers on those occasions and asked for their co-operation and each time I was referred to a Mr. Slater who I understand is district manager of the corporation. By Counsel for Plaintiff: Supervisor. A. Supervisor. I have many times visited the Longview store, having been informed— Q. Which one? A. The Pay'n Takit store, having been told that was the headquarters of Mr. Slater in this district, and I had visited that place of business many times and failed at all times to interview Mr. Slater; never contacted him on one occasion. Q. When you con-

tacted the managers or either one of them, did they ever give you any reason why they referred you to Mr. Slater? A. That the matter was entirely out of their hands was all, about all; that I would have to contact Mr. Slater to take the matter up with him. Q. Did they tell you why it was out of their hands? A. No, they did not give me any definite reason."

On cross-examination, he further testified:

"Q. I understood you never had asked the managers for permission to talk to the men. Is that correct? A. Yes. Q. You never had asked for it, and that you went to the Pay'n Takit store here in Kelso some seven or eight or nine times to see Mr. Slater? A. No, to Longview. Q. I beg your pardon. Of course you understood that is where he held out, when he was there? A. I understand that is his headquarters. Q. Mr. Slater, you know had quite a large district in Oregon and Washington? A. Yes. Q. And that he is here say about four days out of the week? A. I understand that is his headquarters. Q. Did you ever write to Mr. Slater and by letter tell him you wanted to see him and discuss this matter? A. No. All my contacts are personal. Q. You knew he lived in Longview and had his home there? Did you ever call him at his home or call him on his telephone, to get in touch with him? A. No, sir. Q. What you really mean is you went to the store on a number of occasions without any previous arrangement, and he never happened to be there at any time you came? A. That is it."

Fred Herrell, respondents' witness, a member of the grievance committee of the Central Labor Council, testified that, after seeing two of the store managers, he wrote to Mr. M. L. Bean of Portland, district manager of Safeway Stores, and that under date of June 6, 1934, received an answer as follows:

"Dear Sir:

"We acknowledge your letter of the 2nd relative to Clerks' Union in Longview, and have forwarded

your letter to our Mr. A. J. Slater, who is in charge of the stores in that territory.

"Please contact Mr. Slater in all problems of this nature."

He further testified that he and one Greenleaf called on Mr. Slater, and that

". . . he [Slater] seemed to think that it was not necessary to organize them in a union affiliated with the American Federation of Labor. He told us that due to the fact they had their own organization which was probably less expensive than belonging to a bona fide labor organization, and also he said they would probably get more out of that in the way of benefits, that is, for insurance and for social functions, than they would get out of labor organizations, so he did not see why it would be to their benefit to join the labor organization. Mr. Greenleaf, if I recall correctly, and I believe I, too, told him the procedure of organized labor that we was trying to do everything we could in order to bring about an amicable agreement and to get the men into the union, and if they would not co-operate with us and go down the line with the clerks' union, that all we could do would be to report back to the Central Labor Council. At that time I think Mr. Slater agreed to it, and we left it up to the Clerks union again. However, they never got together, and after a length of time action was taken against them at Central Labor Council."

On cross-examination, after saying that he called on the manager of one of the stores for a written agreement for a "closed shop," he further testified:

"Q. After you got this letter back from Mr. Bean referring these matters to Mr. Slater, he told you that in discussing it, he thought the members of the clerks union in their stores, the clerks working in their stores, or employees, really, he thought were getting more out of their organization than they would get out of the Labor Council, did he not? A. Yes. Q. He did not refuse to allow the men to be talked to, did he? A. No. We did not go to him for that pur-

pose. Q. He did not say at any time that if his men did join he would fire them or anything of that kind? A. Oh, no. Q. His attitude was merely, as far as he was concerned, he could not see where it would be best for the men really to join the labor clerks union. You disagreed with him of course, but that was the burden of his talk with you? A. He seemed to think it would be unprofitable to belong to both; they would have to belong to one, no question about that. Q. Did he say anything to the effect that he would discharge any man, or that he would order the men not to join the union or anything of that kind? A. No, sir.''

Mrs. Edith Henderson, respondents' witness, a member of Local No. 148, testified that she asked one of the store managers if she might talk with the clerks about joining the union, and that he said it was perfectly all right outside of working or store hours, but that she never attempted to talk to them outside of store.hours. She arranged the picketing that is here complained of, and provided that it should be done only immediately in front of the stores.

A meat market was maintained in one of the stores, off to itself, somewhat after the fashion of a restaurant in a drugstore. The meat market.had the regulation or display store card, about 10 by 14 inches in size, entitled, in large letters, ''International Union Market,'' bearing the certificate and seal to the effect that it was ''issued. by authority of the Amalgamated Meat Cutters and Butcher Workmen of North America, A. F. of L.'' All of the employees in the meat market were members of the union issuing the card. In the window and newspaper advertising of the different kinds of merchandise kept for sale by the appellant, the meat cutters' union display card was featured. Some witnesses claimed that it was used so as to induce the belief that the whole

store was one hundred per cent union labor—that is, did not separate the meat business from the rest—while other witnesses did not think that contention was justified.

The different views upon this subject are not now of any importance. It is clear from the testimony that, prior to the hearing for a temporary injunction, no complaint was made to the appellant, or any of its representatives, against the manner in which the sign was used, or that the advertisements were misleading; and it is also clear that, upon that claim being made by the respondents at the hearing for a temporary injunction, the display card was no longer used for any purpose except behind the meat market counter. Witnesses on behalf of appellant so testified. Respondents' witnesses also testified to that effect. Robert K. Hunter, president of the Retail Clerks Union, on cross-examination, testified:

"Q. Did you ever go to any of the managers of any of these stores, or did your organization ever write a letter to any managers or ever make complaint that our company had advertisements that were misleading? A. Our business agent was instructed to do so. Q. Did you ever see any such letter he wrote? A. I do not know as he wrote any, or called on them personally. Q. Do you know of your own knowledge he informed the managers in any of these stores, or that they ever heard before we got into this lawsuit that there were any complaints about those advertisements? A. I could not say. I know what we had given orders to do, and my instructions to do, but as to my own knowledge, I did not have to see that they were carried out."

He further testified:

"Q. We had this hearing on the temporary injunction some time in July. What advertisements have we had in the newspapers that you have taken occasion to object to since that time? A. None that I

know of. Q. At that time you were sort of complaining, weren't you, because of the fact that meat sign hung in the window and we had on the window 100% union market, and we had used the meat sign, International union market, and you were objecting to that? A. Yes. Q. That sign that was brought into court and the other one was hung in the window, but afterwards taken down and put back of the counter? A. Yes. Q. The advertisements since that time have been all right as far as you know? A. Yes. Q. Well, you are still picketing? A. Yes.''

E. O. Wessel, respondents' witness, who, at the commencement of the action and at the final hearing of this case, was financial secretary and treasurer of respondent Retail Clerks Union, testified:

''Q. Do you know of any meetings in which the clerk or secretary was instructed to write a letter to any manager of any Safeway or any Pay'n Takit, or to the district manager or any other officer under the Safeway stores, complaining of these advertisements, that they were misleading? A. Not that I remember By Counsel for Defendant: *We will admit for the sake of the record that no such letter was ever written or was ordered to be written or ever thought of.* Q. Let us be frank. You know the reason they picketed was because they did not have union men? That is right, isn't it? A. Yes. Q. If our men joined, and we had gone to our men and got our men to join the clerks' union the picketing would have stopped? A. I suppose so. Q. As a matter of fact you know that, although it was claimed at the time of the temporary hearing some of these advertisements might be misleading, and you have not heard of any of those advertisements since that time being misleading, have you? A. No, sir. Q. The meat market sign that we had here a minute ago that had been in a window that somebody objected to, was put back behind the counter? A. Yes, sir. Q. There can be none of those things still existing excepting this question whether the men belong to the union? A. Yes. Q. Still, you know, picketing is still going on? A. Yes. Q. It will

continue until the court stops it or we get our men to join the union, is that right? A. Yes.''

Mrs. Edith Henderson, on cross-examination, testified:

''Q. Did you or anybody else go to any of the managers in any store or any supervisor, and ask or make complaint about any advertising? A. We are not authorized to. That was not my job. Q. I am asking if you know of anybody that has ever made complaint to them? A. No, sir. Q. Was any action taken at meetings authorizing the president or secretary or anybody to [complain to] them that the advertising was misleading? A. I could not answer that correctly because I did not attend all the meetings. Q. If you say that the first reason for picketing was because of misleading, what is the reason now? At least nothing of that kind exists now, does it? A. The last advertising, you mean? Q. Yes. A. Not to my knowledge. Q. You know that the little signs which were in our window and in direct line with the meat market have been taken out and placed back of the counter? A. I know it has been taken out of the window. Q. You do not know of any reason in the world you should keep pickets there in front of our stores excepting to compel our men to join the union, is that right? A. If the men join by their own choice, they would not have to be compelled, to join, no. Q. I am asking if you know of any reason the pickets are being kept there except to compel the unionization of the store? A. No, sir.''

The financial secretary and treasurer of respondent Local No. 148 testified that it had no income outside of the dues of its members, that it owns no property. Other testimony shows the amount of picketing was reduced because of the lack of funds.

Uncontradicted evidence in the case clearly supports the finding of the trial court that damages to the extent of $2,200 were caused by the picketing from June 25, 1934, to October 11, 1934.

■ In presenting the case, counsel have cited a number of authorities. We find no occasion to review them, other than to refer briefly to one cited by the respondents; because, whether the present case be considered from the standpoint of the alleged invalidity of chapter 7, Ex. Sess. 1933, p. 10, Rem. 1935 Sup., § 7612-1 [P. C. § 3467-21] *et seq.*, or not, the authorities are not helpful, for the reason they involve questions and disputes over terms and conditions of employment. The case of *American Steel Foundries v. Tri-City Central Trades Council,* 257 U. S. 184, 42 S. Ct. 72, 27 A. L. R. 360, so much relied on by the respondents, is not in point. That case involved a strike against an employer over the wages paid its employees. It was so stated in the opinion. There is nothing of that kind in this case.

The vital, controlling question at issue here is plain and easy of solution. It in no way pertains to the relations between the appellant, a merchant, and its employees. For aught that appears, they are content and satisfied, among themselves. On the contrary, this is a lawsuit between appellant and a third party—a labor union that does not include in its membership any employee of the appellant. What right have the respondents to insist or demand, at the threat or cost of the destruction of appellant's business, or at all, that appellant ask, urge or coerce, directly or indirectly, its employees, who are at liberty to do as they please, to join respondents' organization? Of course, there is nothing unlawful in hiring clerks or salesmen who are not members of a local organization such as the respondent; and any attempt, like that in this case, to deny or cripple one's right to do so is an unwarranted attempt by individuals or persons to unreasonably interfere with the freedom of the liberty and property right of contract.

The conduct of respondents, in conjunction with that of appellant, cannot be termed a labor dispute. It is an unwarranted attempt on the part of respondents to compel appellant, against its right of choice, to become active in the cause of respondents, with the result that, upon the failure of that attempt, respondents purposely commenced and continued picketing, to appellant's damage in the large sum of $2,200 in less than four months' time, with the avowed intention of continuing the same, to manifest, irreparable injury and damage to the appellant.

Under the facts and circumstances, the appellant is entitled to the remedy demanded in its complaint, including judgment for damages to the extent found by the trial court.

It is argued by and on behalf of the appellant that chapter 7, Laws Ex. Ses. 1933, p. 10, Rem. 1935 Sup., § 7612-1 [P. C. § 3467-21] *et seq.,* being:

"AN ACT relating to labor, and labor disputes, defining and limiting the powers of the courts of this state in the granting of restraining orders and injunctions in cases involving or growing out of any labor dispute, etc."

is unconstitutional. We do not feel called upon to decide that question now, since this case does not involve any labor dispute.

The judgment is reversed and the case remanded, with directions to the superior court to enter judgment permanently enjoining the respondents and each of them, their agents, servants, members and employees, and all persons associated with them or acting by, through or under them, or any of them, from picketing any of appellant's places of business in Kelso and Longview, Washington; and also enter judgment in favor of appellant against respondents

340

in the sum of $2,200 for damages already suffered by appellant.

TOLMAN, HOLCOMB, STEINERT, and MAIN, JJ., concur.

MILLARD, C. J., sick in hospital, and GERAGHTY, J., attending funeral of his daughter, did not participate in hearing.

BEALS, J. (dissenting)—In my opinion, the question here at issue falls within the term "labor dispute," as defined by subdivision (c), of § 13, chapter 7, Laws Ex. Sess. 1933, p. 17, Rem. 1935 Sup., § 7612-13 [P. C. § 3467-33], quoted in the opinion of the majority. For obvious reasons, I do not wish to express or even form an opinion upon the constitutionality of the act referred to until that question is to be directly passed on by this court.

It is true, as stated by the majority, that this action is between appellant, on the one hand, and a labor union and certain of its officers, on the other, no employee of appellant being a member of the union or apparently interested in its activities. The majority ask:

"What right have the respondents to insist or demand, at the threat or cost of the destruction of appellant's business, or at all, that appellant ask, urge or coerce, directly or indirectly, its employees, who are at liberty to do as they please, to join respondents' organization?"

It seems to me plain that respondents clearly have the fundamental right to do certain things which would probably tend to bring about the result referred to. Whether or not respondents may picket appellant's place of business, is one question; but respondents may certainly, in certain publications or by some other methods for the dissemination of information, state that appellant's employees do not belong to the

union and urge that, for this reason, appellant's business should not receive the patronage of members of the union or of persons who sympathize with its principles. Such a campaign might well injure appellant's business; but, in the absence of fraud, violence or intimidation, I know of no reason why a union or its officers or members cannot lawfully apprise the public at large of facts from which the union and its sympathizers desire that certain results may follow.

As to the right of a labor union or of anyone else to place pickets directly in front of a business establishment, I express no opinion.

The record clearly shows that appellant in its advertising improperly used the union card issued to the butcher shop in an attempt to make it appear to the public at large that its establishment was unionized. This advertising the union could properly resent, and show its resentment by any lawful means. The objectionable advertising was soon discontinued, but as some portion of the damages found by the trial court were incurred before such discontinuance, it seems to me that the award of damages based upon the finding, in part at least, is not justified by the record.

For the reasons stated, I am not in accord with the opinion of the majority.

BLAKE, J. (dissenting)—I concur with Judge Beals. On the record presented here, the judgment of the trial court should be affirmed.