[No. 27554. Department One. September 13, 1939.]

UNITED UNION BREWING COMPANY, *Appellant*, v. DAVE BECK *et al., Respondents.*[1]

*Henry Clay Agnew*, for appellant.

*Vanderveer & Bassett* and *Clarence J. Coleman*, for respondents.

[1]Reported in 93 P. (2d) 772.

STEINERT, J.—This was an action to recover damages for loss of business sustained by plaintiff through the alleged wrongful and malicious acts of the defendants, and to obtain a permanent injunction restraining defendants from directly or indirectly interfering with the marketing of plaintiff's beer and, specifically, from directly or secondarily boycotting such product. By stipulation of the parties at the end of the trial, plaintiff's prayer for damages was withdrawn and certain of the defendants were dismissed from the action.

At the conclusion of the hearing by the court, a decree was entered, to which the remaining defendants consented, permanently enjoining them

". . . from employing any threats or intimidations as a means of deterring any merchant from supplying any of plaintiff's customers with commodities or products used or useful in the conduct of their business,"

but in all other respects denying plaintiff's prayer for relief.

Deeming itself aggrieved by the inadequacy of the order, in that it did not grant the full relief sought, plaintiff has appealed.

The respective contentions of the parties can best be indicated by a resume of the pleadings.

The complaint presents the situation substantially as follows: Appellant is a corporation organized and qualified under the laws of the state of Washington and is engaged in the business of manufacturing beer, known as Old Empire Beer, and wholesaling it throughout the various counties of this state. Its employees are all members of the International Union of United Brewery, Flour, Cereal and Soft Drink Workers of America, which, for brevity, we shall refer to as Brewery Workers Union. There never has been any dispute between appellant and any of its employees

over wages, hours, conditions of employment, or any other matter.

Respondent Dave Beck is an international organizer for International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers, hereinafter referred to as the Teamsters Union. The other respondents are local unions under charter from either the parent Teamsters Union or the Culinary Workers and Bartenders Union, which latter is hereinafter referred to as Culinary Workers Union. As such international organizer, Beck exercises complete domination and control over each of the respondent local unions.

During the year preceding December, 1938, respondent Beck, solely for the malicious purpose of destroying appellant's business, directed the respondent local unions in a systematic effort designed to prevent the marketing and distributing of appellant's product. Pursuant to such directions, the respondent locals of the Teamsters Union have refused to deliver products of any kind to any place of business in this state which buys, sells, or possesses appellant's beer, and the respondent locals of the Culinary Workers Union have refused to furnish any bartenders or any employees to any restaurant or tavern that buys, sells, or possesses such beer. Furthermore, the respondent local unions have picketed every retail business in this state which handles appellant's product; the pickets bear signs stating that such picketed premises are unfair to organized labor, although, in fact, no labor dispute exists or has existed at any of such places.

A group of defendants, who by the stipulation were dismissed from the action, are engaged in the business of wholesaling merchandise to restaurants, taverns, and other retail businesses handling beer. Pursuant to respondent Beck's directions, these defendants have refused, and still refuse, to sell or deliver any product

or furnish any service to such places of business as buy, sell, or possess beer manufactured by appellant. As a consequence, appellant's customers engaged in the retail business are prevented from obtaining desired merchandise and services.

This conduct of respondents has substantially decreased the sale of appellant's beer in this state, and if allowed to continue will cause appellant irreparable damage.

The foregoing constitutes the material allegations of appellant's complaint.

In their answers, respondents deny all the allegations of the complaint except that appellant's employees are members of the Brewery Workers Union. By way of an affirmative defense, respondents present their side of the controversy as follows: Appellant was organized as a corporation by the Brewery Workers Union, and all its stock is closely held by that organization. Both the Brewery Workers Union and the Teamsters Union were organized pursuant to charters issued by the American Federation of Labor, which we will hereinafter refer to as A. F. of L.

In 1933, a controversy arose between the two unions, as to which had jurisdiction over drivers employed on brewery trucks. Pursuant to the constitution and laws of A. F. of L., that controversy was submitted to the general executive council of the federation for decision. The council decided that jurisdiction over the drivers belonged to the Teamsters Union and not to the Brewery Workers Union. Thereupon, the Brewery Workers Union appealed consecutively to the conventions of A. F. of L. held in the years 1934, 1935, and 1936, and at each of those conventions the decision of the general executive council was, after full hearing, sustained. Nevertheless, the Brewery Workers Union and the appellant herein, acting in open defiance of

the decisions of A. F. of L., have continued to man all brewery trucks with members of the Brewery Workers Union, and the members of that union have boycotted the products of all breweries in this state which employed members of the Teamsters Union, as a consequence of which the respondent local unions have, in turn, refused, and now refuse, to haul any product of appellant or to patronize or render any service to any retailer of appellant's products.

Appellant, though contending that respondents' affirmative defense is immaterial to the issues here involved, nevertheless comes forward by way of reply and, after admitting that a majority of its stock is owned by members of the Brewery Workers Union, gives its version of the preexisting controversy between the two unions as follows:

Shortly after its organization in 1887, the Brewery Workers Union, which comprised all employees of the brewing industry including beer truck drivers, was granted a certificate of affiliation by A. F. of L. No Teamsters Union or any union of drivers was granted a certificate of affiliation until twelve years later. One of the objects of A. F. of L., as provided by its constitution, is the establishment of trade unions based upon a strict recognition of the autonomy of each trade and the promotion and advancement of such bodies. The constitution further provides that no charter shall be granted by A. F. of L. to any national, international, trade, or federal labor union without a positive and clear definition of the trade jurisdiction claimed by the applicant, and that no charter shall be granted such applicant if the jurisdiction claimed trespasses on the jurisdiction of any existing affiliated union, unless such affiliate gives its written consent thereto. The A. F. of L. has no authority or control over the jurisdiction

of the Brewery Workers Union, nor can it transfer such jurisdiction to another.

The brewing and delivery of beer throughout the United States, except in the state of Washington and to some extent in the state of Oregon, are now conducted by the Brewery Workers Union.

In 1934, a proposition that the Teamsters Union be given jurisdiction over certain drivers was submitted to a referendum vote of the members of the Brewery Workers Union, and the result of that vote was 170 in favor of such proposal and 14,161 against it.

There are in the United States approximately twelve thousand members of the Brewery Workers Union who are engaged as beer truck drivers. For many years, the Brewery Workers Union has issued charters throughout the principal cities of the United States to local unions composed of members who are either exclusively beer truck drivers or else handle, in part, deliveries of all brewery products; these locals and their members participate in the sick benefits and insurance features provided by their parent union.

In spite of these general conditions pertaining to jurisdiction, respondents Beck and the Teamsters Union have by illegal boycotts seized control of all breweries in the state of Washington except that of appellant and are engaged not only in the delivery, but also in the brewing and bottling, of beer.

The pleadings, as we have summarized them, present the background which gave rise to this controversy and reveal the existence of a protracted struggle between two powerful international unions for the right to exercise jurisdiction over a particular type of employment.

The evidence introduced upon the trial, as it appears from a narrative statement of facts, is not in dispute.

Appellant called as witnesses seventeen tavern oper-

ators, a hotel keeper, a bartender, the secretary of the Brewery Workers local union, and two of its own employees, a salesman and a truck driver.

The testimony of the various tavern keepers, though differing circumstantially, evidenced the same type of conduct and purpose on the part of respondents. For brevity, we quote from but one of them, as illustrative of the general tenor. Leo Delorme's testimony, taken verbatim from the statement of facts, was as follows:

"I own and operate a tavern in Yakima County, Washington, situated just outside the city limits of Yakima. About the 3rd day of December, 1938, I started selling Old Empire Beer which I purchased from the plaintiff. Mr. Dick Howard, an official of the Bartenders' Union Local 624, told me that unless I stopped selling this beer he would forbid my employees, who were members of his union, to work and would picket the place. I told him I had bought the beer and would sell it, so my employees left and my place has been picketed since and is now being picketed. The pickets carry a sandwich sign upon which is printed 'Delorme's Tavern unfair to organized labor.' Mr. McCoy of the Teamsters' Union told me that any teamster who delivered to my tavern while I had Old Empire Beer would be subject to a $250 fine by the Teamsters' Union. Immediately upon my putting in the beer I was unable to get delivery of other commodities which I sell at my tavern."

Other tavern keepers testified that, upon their discontinuing the sale of appellant's beer, respondents' opposition ceased.

The hotel keeper testified as follows:

"I operate the Green Hotel in Hoquiam, Washington. I put in Old Empire beer about November, 1937. Since that time, I have not been able to get deliveries of anything to the hotel."

The ice man testified as follows:

"I am in the ice business. I buy my ice at the Blue Ribbon in Bellingham and make my living selling it.

I take my own truck. About August 12, 1938, Mr. White and an officer of the Teamsters Union told me that unless I stopped delivering ice to the Marine Tavern in Bellingham that they would see that I lost my other customers so I stopped making deliveries."

The bartender testified:

"I am employed as a bartender at the Commercial Tavern in Everett. After the owner put in Old Empire Beer for sale the place was immediately picketed by the Culinary Workers' Union of Everett. Mr. Goodrich, the business agent of the union, came in and took the union card out of the house. Prior to that time the employees were all union but they were called out. All the employees were satisfied and there was no dispute other than the sale of the beer."

The truck driver testified:

"I am a driver for the United Union Brewing Company. I am a member of the Brewery Workers' Union. I was returning through Everett from Bellingham with a load of beer. Goodrich of the Culinary Workers' Union told me to get the truck out of town. A little later on near Sultan, Washington, my truck was shot up by a group of men including Anthony Harn and Goodrich of the Culinary Workers.

CROSS-EXAMINATION.

"I procured a warrant for their arrest but they have never been apprehended."

The salesman testified:

"I am employed as a salesman for the United Union Brewing Company. In February, 1938, we had been making it a point to be present in taverns because our beer drivers had been followed from place to place by squads of men in cars. In this month Mr. Reese and myself stopped at Andy's Tavern in Seattle while our driver came in with some beer. He was followed by two car loads of men. All of them wore teamsters' buttons. They followed him inside the tavern. Billy Vitro was one of the men. I was knocked down by one of the men. Vitro said we would have to get the

beer out of there and our driver refused. The driver's helper was thrown to the floor and beaten over the head with a flash light and knocked unconscious. There were two criss-cross wounds across his head which had to be sewed up. Our driver had a gun and finally drove them out, holding one car load until the police came. The men were tried in police court at the time and convicted and given six months but appealed and Mr. Warner has refused to proceed with the case.

"We had at one time about sixty accounts in Tacoma until the Teamsters put in the rule about delivery of all other products. We lost all the accounts but about three."

The secretary testified:

"I am the secretary of the Brewery Workers' Local, having jurisdiction in the territory of Walla, Walla. All the employees of the United Union Brewing Company are members of this local, including the beer drivers. All of the employees are satisfied with their wages, hours and conditions of employment and there is no labor dispute.

CROSS-EXAMINATION

"The stock in the plaintiff corporation is owned by the International Brewery Workers' Union. This brewery in Walla Walla as well as one in Tacoma formerly belonged to the Northwest Brewing Company, which was a corporation controlled by Pete Maranoff. The Brewery Workers' International Union had loaned this company money and when the company became insolvent, foreclosed a mortgage against the Tacoma Brewery and the Walla Walla Brewery and bought them at Sheriff's sale. The plaintiff corporation was then organized to operate them. The only brewery that operates is the one at Walla Walla. I am familiar with the fact that in 1933 the executive board of the American Federation of Labor awarded jurisdiction of beer drivers to the Teamsters' Union and that this ruling was approved by a majority vote of the convention of the American Federation of Labor in 1933. Defendants' Exhibit 9 is the Minute Book of the American Federation of Labor showing such ruling. The Brewery Workers' Union has refused to

recognize the ruling. In 1934 this court restrained our Local Union in Cause No. 267047 from picketing Hemrich Brewing Company or from distributing literature stating that Hemrich's beer was unfair. Defendants' Exhibit 10 contains the original restraining order. I do not know whether or not any more literature was distributed after the restraining order. We do regard beer delivered by the Teamsters' Union as being unfair and refuse to patronize it. The C. I. O. has voted beer unfair that is manufactured by the Teamsters and not by the Brewery Workers. I know that many taverns sell our beer in order to get the patronage of members of the C. I. O."

At the conclusion of appellant's evidence, and after respondents' challenge to its sufficiency and their motion to dismiss appellant's application for a restraining order had been denied, respondents called but one witness, who testified as follows:

"I am an attorney and am also an officer of the Pacific Northwest Brewery Association. On January 17, 1934, we tendered Mr. Craine and other officers of the Brewery Workers' Union, a contract whereby the Brewery Workers were granted jurisdiction of all workers in our breweries except beer drivers and gave them ten days to sign the agreement and to concede the jurisdiction of the beer drivers to the Teamsters. They refused to sign the agreement within ten days. We then awarded the work to the unions organized by the Teamsters. After this literature was distributed declaring our beer unfair. This was done by the Brewery Workers' Union. Recently several Unions affiliated with the C. I. O. have passed resolutions not to patronize beer manufactured by our breweries and have sent copies of these resolutions to various breweries.

CROSS-EXAMINATION

. "I do not know from my own knowledge whether or not the action of the C. I. O. was solicited by the Brewery Workers. I know of no literature against any of our beer distributed by the Brewery Workers after October, 1937. Eastern beer such as Pabst,

Hamm's and Budweiser, is manufactured by breweries in which the brewery drivers are affiliated with the Brewery Workers' Union. This condition is true all over the United States except in the state of Washington, the city of Cleveland, Ohio, and I believe to some extent in Chicago. There was a period of about ten months when the Teamsters kept the eastern beer out of the state of Washington. It was immediately after the memorandum decision of Judge Cushman, as shown by plaintiff's exhibit 4 for identification, that the eastern beer was allowed in the state of Washington again. I do not believe the decision had anything to do with it. I know that after the decision of the American Federation of Labor Convention of 1933 awarding jurisdiction to the Teamsters Union of beer drivers that under the supervision of Mr. Green, President of the American Federation of Labor, a vote was taken of the members of the Brewery Workers' Union as to their desire on the change of affiliation and the result of the vote was approximately fourteen thousand against the change of affiliation to one hundred seventy in favor of changing. I do not believe that the election was fairly conducted, as it was apparent that the members of the Brewery Workers' Union were influenced by their officers."

We now proceed to the questions which are suggested and argued upon the appeal.

Respondents take the position squarely that the only question involved is whether the Brewery Workers Union or the Teamsters Union has jurisdiction over brewery truck drivers. By "jurisdiction" in this instance is meant the right to accept such drivers as members and to represent them in the negotiation of employment contracts and the settlement of disputes with their employers. Respondents assert that, as members of the Teamsters Union, an affiliate of A. F. of L., they have the right to enforce obedience to parental authority by withholding their labor and patronage from all beer taverns that patronize appellant's

brewery. Appellant insists that the orders of A. F. of L. through its executive council and in convention, awarding such jurisdiction to the Teamsters Union, are void because in violation of the constitution of the federation.

We will not undertake to decide, in this case, whether such orders were valid or invalid. There are two reasons for the position we take: (1) Neither the A. F. of L., nor the international body of Brewery Workers Union nor any local union of that body, nor the international body of Teamsters Union, is a party to this controversy, and, so far as this case is concerned, any question regarding the validity of the orders referred to is a collateral matter; and (2) in any event, a decision of that question is unnecessary in the determination of the real issue involved in this case. Whatever may be the background of this controversy and whatever strife between two rival labor organizations may yet lurk therein, the immediate question before us is whether the appellant, a private corporation organized and doing business under the laws of this state, may appeal to the courts for the protection of its property rights.

We clearly recognize the fact that the stockholders of the appellant corporation are members of one of the two rival labor organizations. We are also aware that one of these labor organizations at one time loaned money to the former owner of appellant's brewery for the evident purpose of enabling its members to secure exclusive employment therein adverse to the interests of the other labor organization. Neither of these considerations is material in this case. The mortgage securing the loan was foreclosed, and the brewery was bought at execution sale by the mortgagee. The appellant was organized to take over and operate the brewery which had been subject to the mortgage.

Although its stock is owned by members of the Brewery Workers Union, appellant stands exactly in the same position as any other corporation with respect to the right to acquire property and conduct business, so long as it complies with the laws of this state.

In our opinion, this appeal presents, for ultimate determination, two issues, or, more properly perhaps, one issue which may be considered from two approaches.

The first question is whether or not respondents may lawfully use the methods which they have employed, in order to compel appellant to hire, as truck drivers, only those who are members of the Teamsters Union, or to compel appellant's employees to join that union.

The workers employed by appellant have selected their own bargaining agency, as they had the right to do. The "labor disputes" act of this state, Laws of 1933, Ex. Ses., chapter 7, p. 10 (Rem. Rev. Stat. (Sup.), § 7612-1 [P. C. § 3467-21] et seq.), in announcing the public policy of this state, recognizes that the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment,

". . . wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protections; . . ." Laws of 1933, Ex. Ses., chapter 7, p. 10, § 2 (Rem. Rev. Stat. (Sup.), § 7612-2 [P. C. § 3467-22]).

It is to be borne in mind that no member of the Teamsters Union has ever been employed by appellant; and, further, that there is no dispute whatever upon any subject between appellant and its own employees.

In *Safeway Stores v. Retail Clerks' Union,* 184 Wash. 322, 51 P. (2d) 372, the officers and members of a local union picketed plaintiff's places of business for the purpose of compelling plaintiff's employees to join the union. No dispute existed between plaintiff and its employees, and none of its employees were members of the union. In directing that a decree be entered permanently enjoining defendants from picketing any of plaintiff's places of business, we said:

"The vital, controlling question at issue here is plain and easy of solution. It in no way pertains to the relations between the appellant, a merchant, and its employees. For aught that appears, they are content and satisfied, among themselves. On the contrary, this is a lawsuit between appellant and a third party—a labor union that does not include in its membership any employee of the appellant. What right have the respondents to insist or demand, at the threat or cost of the destruction of appellant's business, or at all, that appellant ask, urge or coerce, directly or indirectly, its employees, who are at liberty to do as they please, to join respondents' organization? Of course, there is nothing unlawful in hiring clerks or salesmen who are not members of a local organization such as the respondent; and any attempt, like that in this case, to deny or cripple one's right to do so is an unwarranted attempt by individuals or persons to unreasonably interfere with the freedom of the liberty and property right of contract.

"The conduct of respondents, in conjunction with that of appellant, cannot be termed a labor dispute. It is an unwarranted attempt on the part of respondents to compel appellant, against its right of choice, to become active in the cause of respondents, with the result that, upon the failure of that attempt, respondents

purposely commenced and continued picketing, to appellant's damage in the large sum of $2,200 in less than four months' time, with the avowed intention of continuing the same, to manifest, irreparable injury and damage to the appellant."

A similar state of facts was involved in *Adams v. Building Service Employees etc. Union,* 197 Wash. 242, 84 P. (2d) 1021. In upholding the injunctive feature of the decree, we said:

"An adjustment to the satisfaction of appellants of their controversy with respondent might result in shorter hours and increased pay for respondent's employees; however, none of those employees is a member of appellant union, and there was no controversy between respondent and his employees. The purpose of the picketing was to compel respondent's employees, who were unwilling to join Local No. 6 unless respondent also signed the agreement demanded by appellants, to become members of the picketing union; that is, respondent was to be compelled at the cost of the destruction of his business to coerce his employees, who are at liberty to do as they please, to join appellants' organization."

In *Blanchard v. Golden Age Brewing Co.,* 188 Wash. 396, 63 P. (2d) 397, this same character of controversy was before this court as a result of the concerted action of certain breweries and the members of the Teamsters Union to compel members of the Brewery Workers Union to join the rival union. In upholding the contempt action taken by the trial court following its decree of injunction, we said:

"The action of the owners was contrary to the public policy announced in the very legislative act on which all of the defendants formerly relied and on which the appellant even now relies. But the case goes deeper than that. It is a case where it has been made to appear that one set of employees, through threats of strikes and boycotts, is seeking to compel a group of employers to discharge another set of employees whose

relations with their employers have been in all respects harmonious. This is unwarranted. No one has a right to coerce an employer, by threats of violence or of activities which will inevitably lead to great financial loss, in order to compel the discharge of an employee. . . .

"The right to earn a livelihood and to continue in employment unmolested by unwarranted activities of third persons is entitled to protection in equity. *Truax v. Raich,* 239 U. S. 33, 36 S. Ct. 7, 60 L. Ed. 131, Ann. Cas. 1917B, 283. A correlative principle is that the employer has the right freely to maintain relations of employment with whomsoever he desires, and no one has the right purposely to disrupt or interfere with those relations by the intentional resort to such measures as will obviously, and in the ordinary course of events, inflict irreparable injury upon the employer. *Hitchman Coal & Coke Co. v. Mitchell,* 245 U. S. 229, 38 S. Ct. 65, 62 L. Ed. 260, Ann. Cas. 1918B, 461."

In the very recent case of *Fornili v. Auto Mechanics' Union etc., ante* p. 283, 93 P. (2d) 422, the same question, arising under slightly different factual circumstances, was presented.' The cases from which we have quoted above were cited with approval and the same conclusion reached. We said:

"It is not clear from the record whether the purpose of the picketing was to coerce the appellants [employers] into having their employees become union men, or whether its purpose was to punish them for failing to live up to the terms of their contract while it was in effect. In either event, the picketing was not lawful."

In the case at bar, the purpose of respondents in committing the acts complained of was to compel appellant to substitute for its present employees other employees, or to compel appellant's employees to become members of the Teamsters Union. The purpose was unlawful. To accomplish that purpose, resort was had to acts destructive of appellant's business. Those

acts were likewise unlawful and the proper remedy was by injunction.

The second, and principal, question is whether or not, in any event, appellant is entitled to the relief sought, on the theory that the actions of respondents constituted a secondary boycott.

While the term "secondary boycott" is of somewhat vague signification and has no precise and exclusive denotation, the courts, both Federal and state, are agreed that any combination will be held to be a secondary boycott if its purpose and effect are to coerce customers or patrons, through fear of loss or bodily harm, to withhold or withdraw their business relations from the employer who is under attack.

"The substance of the matters here complained of is an interference with complainant's interstate trade, intended to have coercive effect upon complainant, and produced by what is commonly known as a 'secondary boycott,' that is, a combination not merely to refrain from dealing with complainant, or to advise or by peaceful means persuade complainant's customers to refrain ('primary boycott'), but to exercise coercive pressure upon such customers, actual or prospective, in order to cause them to withhold or withdraw patronage from complainant through fear of loss or damage to themselves should they deal with it." *Duplex Printing Press Co. v. Deering,* 254 U. S. 443, 41 S. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196.

"A secondary boycott may be defined as a combination to cause a loss to one person by coercing others against their will to withdraw from him their beneficial business intercourse, by threats that unless those others do so, the combination will cause similar loss to them, or by the use of means as the infliction of bodily harm on them or such intimidation as will put them in fear of bodily harm." *Smythe Neon Sign Co. v. Local Union No. 405 etc.,* 284 N. W. (Iowa) 126.

"The law recognizes what may be called two species of boycotts. One a primary boycott that is applied

directly and alone to the offending person, by withdrawing from him all business relations on the part of the organization that initiated the boycott, and the other a secondary boycott that becomes effective when the members of the organization refuse to have any business relations with persons dealing with the offender until he has yielded to the demands of the organization." *Booker & Kinnaird v. Louisville Board of Fire Underwriters*, 188 Ky. 771, 224 S. W. 451, 21 A. L. R. 531.

"The method adopted in this case presents a clear case of attempted boycotting, both primary and secondary. The purpose of a *secondary* boycott is to bring to bear a duress upon the customers of the person under attack, by threatening them directly or indirectly with a boycott, if they persist in trading with such person." *Ellis v. Journeymen Barbers' International Union,* 194 Iowa 1179, 191 N. W. 111, 32 A. L. R. 756.

See, also, 32 C. J. 167, § 233.

While there are some decisions to the contrary, notably in California and Montana, the weight of authority is that a conspiracy, combination or continuance of acts, formed or designed to injure a person's business by coercing his customers, or prospective customers, into withholding or withdrawing their patronage from him by acts or threats of injury to the customer's business if he fails to comply with the demands of the conspirators or combatants, constitutes a secondary boycott and will be restrained by a court of equity. 32 C. J. 168, §§ 235 (b), 236(bb); 172, § 244(bb). In addition to the cases cited in the footnotes to the foregoing text, see, also, *Armstrong Cork &.Insulation Co. v. Walsh,* 276 Mass. 263, 177 N. E. 2; *Yankee Network, Inc. v. Gibbs,* 3 N. E. (2d) (Mass.) 228; *Newark Morning Ledger Co. v. Suburban Newsdealers' Ass'n* (N. J. Ch.), 9 N. J. Misc. 373, 154 Atl. 534; *Mitnick v. Furniture Workers Union, etc.,* 124 N. J. Eq. 147, 200 Atl.

553; *Commercial House & Window Cleaning Co. v. Awerkin,* 138 Misc. 512, 240 N. Y. Supp. 797; *George F. Stuhmer & Co. v. Korman,* 241 App. Div. 702, 269 N. Y. Supp. 788; *Chapman v. Doe,* 7 N. Y. Supp. (2d) 470; *Bomes v. Providence Local No. 223 etc.,* 51 R. I. 499, 155 Atl. 581.

Many cases from the Federal courts have condemned the secondary boycott as being in violation of the anti-trust laws and have upheld the power of the courts to restrain such activities. *Hitchman Coal & Coke Co. v. Mitchell,* 245 U. S. 229, 62 L. Ed. 260, 38 S. Ct. 65, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461; *Duplex Printing Press Co. v. Deering,* 254 U. S. 443, 41 S. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196; *Bedford Cut Stone Co. v. Journeymen Stone Cutters' Ass'n,* 274 U. S. 37, 71 L. Ed. 916, 47 S. Ct. 522, 54 A. L. R. 791; *Local 167 of International Brotherhood of Teamsters, etc. v. United States,* 291 U. S. 293, 54 S. Ct. 396, 78 L. Ed. 804; *Waitresses' Union, Local 249 v. Benish Restaurant Co.* (C. C. A.), 6 F. (2d) 568; *International Organization, etc. v. Red Jacket C. C. & C. Co.* (C. C. A.), 18 F. (2d) 839; *Aeolian Co. v. Fischer* (C. C. A.), 40 F. (2d) 189; *Hicks v. Bekins Moving & Storage Co.* (C. C. A.), 87 F. (2d) 583; *Columbus Heating & Ventilating Co. v. Pittsburgh Building Trades Council* (D. C. Penn.), 17 F. (2d) 806; *Alco-Zander Co. v. Amalgamated Clothing Workers* (D. C. Penn.), 35 F. (2d) 203; *United States Gypsum Co. v. Heslop* (D. C. Iowa), 39 F. (2d) 228.

This court has previously recognized the bases upon which injunctive relief against secondary boycott is rested. In *Jensen v. Cooks' & Waiters' Union,* 39 Wash. 531, 81 Pac. 1069, although it did not, strictly speaking, involve a case of secondary boycott, we said:

"Men cannot lawfully jointly congregate about the entrance of one's place of business, and there, either by persuasion, coercion, or force, prevent his patrons and the public at large from entering his place of business or dealing with him. To destroy his business in this manner is just as reprehensible as it is to physically destroy his property.. Either is a violation of a natural right, the right to own, and peaceably enjoy, property."

See, also, *Pacific Typesetting Co. v. International Typographical Union,* 125 Wash. 273, 216 Pac. 358, 32 A. L. R. 767.

A person's business constitutes a property right and, if lawful, is entitled to protection from any unlawful interference. *Safeway Stores v. Retail Clerks' Union,* 184 Wash. 322, 51 P. (2d) 372; *Truax v. Corrigan,* 257 U. S. 312, 66 L. Ed. 254, 42 S. Ct. 144, 27 A. L. R. 375; *Meadowmoor Dairies v. Milk Wagon Drivers' Union etc.,* 21 N. E. (2d) (Ill.) 308, 32 C. J. 168, § 235 (b).

We have in this case the following elements: (a) Property rights involved; (b) unlawful interference with such rights by acts constituting a secondary boycott and involving (c) intimidation, threats, and violence; and, as a result, (d) the owner of such property rights being threatened with great and irreparable injury.

Appellant is entitled to a decree enjoining respondents from actively interfering with the marketing of appellant's beer; from picketing, or threatening to picket, any of appellant's customers or prospective customers because such customer, present or prospective, handles or attempts to handle beer manufactured by appellant; and from interfering in any way with the delivery of other products or commodities to any of such customers or prospective customers because they handle or attempt to handle such beer.

The cause is remanded to the superior court for modification of the decree as herein indicated.

MAIN, ROBINSON, and JEFFERS, JJ., concur.

BLAKE, C. J. (dissenting)—I dissent not only for the reasons stated in my dissenting opinion in the case of *Fornili v. Auto Mechanics' Union etc., ante* p. 283, 93 P. (2d) 422, but also for the following reasons:

Applying the *alter ego* doctrine, the appellant is in reality the instrumentality of the Brewery Workers' Union. That union and respondent International Brotherhood of Teamsters are both affiliates of the American Federation of Labor. For several years, these two unions have been engaged in a dispute over the jurisdiction of drivers of vehicles employed in the brewery business. The instant law suit arises out of that controversy. The controversy has several times been submitted to bodies of the American Federation of Labor having jurisdiction of such matters, and each time there has been a decision confirming the jurisdiction of the Teamsters Union over the drivers.

Under such facts as these, it is universally held that the courts will not take jurisdiction of the controversy. In 4 Am. Jur. 466, the applicable rule is stated as follows:

"It is well established that courts will not interfere with the internal affairs of voluntary associations, except in such cases as fraud or lack of jurisdiction. Accordingly, it is held that mandamus will not lie to regulate the affairs of unincorporated societies or associations, at least not in the absence of a permissive statute. Nor will an injunction be granted where the association is proceeding in accordance with its rules and within the scope of its jurisdiction. *The decisions of the tribunals of an association with respect to its internal affairs will, in the absence of mistake, fraud, collusion, or arbitrariness, be accepted by the courts as conclusive.* Moreover, it is held that the courts will

not undertake to inquire into the regularity of the procedure adopted and pursued by such tribunals in reaching their conclusions." (Italics mine.)

Moreover, this court has recognized and applied the rule. *Kelly v. Grand Circle etc. Woodcraft,* 40 Wash. 691, 82 Pac. 1007; *Stivers v. Blethen,* 124 Wash. 473, 215 Pac. 7. In the former case, the court said:

"In cases of this kind 'courts never interfere, except to ascertain whether or not the proceeding was pursuant to the rules and laws of the society, whether or not the proceeding was in good faith, and whether or not there was anything in the proceeding in violation of the laws of the land.' *Connelly v. Masonic Mut. Benefit Ass'n,* 58 Conn. 552, 18 Am. St. 296, 9 L. R. A. 428."

Applying this rule, the action should be remanded to the superior court with directions to dismiss.